**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-4752**

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

MIGUEL ZELAYA, a/k/a Most Wanted,

        Defendant – Appellant.

**No. 16-4857**

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

LUIS ORDONEZ-VEGA, a/k/a Big Boy,

        Defendant – Appellant.

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

JORGE SOSA, a/k/a Koki, a/k/a Loco,

        Defendant – Appellant.

No. 17-4052

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

WILLIAM GAVIDIA, a/k/a Duro,

        Defendant – Appellant.

Appeals from the United States District Court for the Western District of North Carolina, at Charlotte. Robert J. Conrad, Jr., District Judge. (3:15-cr-00121-RJC-DSC-37; 3:15-cr-00121-RJC-DSC-22; 3:15-cr-00121-RJC-DSC-29; 3:15-cr-00121-RJC-DSC-13)

Argued: September 28, 2018                Decided: November 14, 2018

Before KING, DUNCAN, and FLOYD, Circuit Judges.

Affirmed by published opinion. Judge Duncan wrote the opinion, in which Judge King joined.  Judge Floyd wrote an opinion concurring in part and dissenting in part.

———————

**ARGUED:**  William Robinson Heroy, GOODMAN, CARR, LAUGHRUN, LEVINE & GREENE, Charlotte, North Carolina; Lisa S. Costner, LISA S. COSTNER, PA, Winston-Salem, North Carolina; Walter Hoytt Paramore, III, LAW OFFICES OF W.H. PARAMORE, III, Jacksonville, North Carolina; Aaron Edmund Michel, Charlotte, North Carolina, for Appellants.  William Michael Miller, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.  **ON BRIEF:**  Dana O. Washington, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

———————

DUNCAN, Circuit Judge:

Appellants Miguel Zelaya, Luis Ordonez-Vega, Jorge Sosa, and William Gavidia were each convicted of participating in a racketeering conspiracy under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d). Zelaya, Ordonez-Vega, and Sosa were also convicted of committing violent crimes in aid of racketeering under 18 U.S.C. § 1959 ("VICAR") and of using a firearm in furtherance of a violent crime under 18 U.S.C. § 924 for their respective roles in several unrelated shootings. Appellants challenge these convictions on twelve separate grounds, and Appellant Gavidia challenges his sentence. Finding no reversible error, we affirm.

I.

Appellants are members of the street gang La Mara Salvatrucha, or MS-13. Formed in the 1980s by Salvadoran immigrants to Los Angeles for protection against rival street gangs, MS-13 has grown into a violent organization with active "cliques," or local chapters with varying levels of autonomy, operating throughout the United States and several Central American countries. MS-13 cliques may extort local businesses or drug dealers, participate in international narcotics trafficking, and remit funds to gang leadership in El Salvador. Appellants were members of MS-13 cliques in and around Charlotte, North Carolina. We briefly describe the relevant background of each Appellant and provide additional information as necessary in the context of their respective arguments.

4

Zelaya became interested in MS-13 at a young age. He held himself out to MS-13 leaders in Charlotte as a fully-initiated member and engaged in bar fights with rival gangs alongside MS-13 associates. On December 18, 2013, Zelaya shot and killed Jose Ibarra outside of a bar, believing that Ibarra had threatened a friend. Ballistics evidence connected Zelaya to the shooting, and he confessed to police after waiving his *Miranda* rights. In his confession he accurately described the murder scene. Before trial but while imprisoned, he bragged to another MS-13 member about the killing.

Ordonez-Vega was already an MS-13 member when he moved from New York to Charlotte. Police in New York had encountered Ordonez-Vega in connection with anti-gang efforts, and had noted a "Mara Salvatrucha" tattoo across his chest. On June 6, 2014, Ordonez-Vega and several other MS-13 members, including Christian Pena, were gathered in a parking lot outside of a strip mall. They noticed Noel Navarro-Hernandez riding his bicycle in circles around a parked car belonging to one of the MS-13 members. After Navarro-Hernandez entered the mall, the MS-13 members determined that he was likely a rival and plotted to rob him. Pena and Ordonez-Vega executed the plan. When Navarro-Hernandez came out of the mall, Pena directed him to go behind the building where Ordonez-Vega was waiting. Pena accompanied Navarro-Hernandez. When they arrived behind the mall, Ordonez-Vega shot Navarro-Hernandez to death.

Sosa was a member of the MS-13 clique Charlotte Locotes and also participated in gang fights as an MS-13 member. On the evening of June 30, 2013, Sosa was drinking at a private residence with his cousin Tomas Maradiaga (who is not affiliated with MS-13). Sosa started arguing with a man who had not paid for his drinks, and the argument

5

escalated. It spilled onto the front lawn of the house, where the man brandished a stick at Sosa. Sosa left the party with Maradiaga and retrieved an assault rifle. They returned as the individual with whom Sosa had argued was leaving in a car with another guest. Sosa and Maradiaga drove after them and shot at their car repeatedly, although no one was killed. After the shooting, Fec Rodriguez Vareal, or "Chelito," a fellow MS-13 member, called Maradiaga to warn him to leave town.

Gavidia was a member of the Coronados Little Cycos Salvatrucha clique. As part of the clique, he committed robberies, sold cocaine, and taxed drug dealers. Eyewitnesses described several gang-related gunfights in which Gavidia participated. In January 2010, Gavidia was involved in a shootout between his clique and a rival gang outside of a Charlotte club. Although he did not fire a weapon during the fight, he helped another gang member reload his gun. In January 2013, Gavidia was involved in another fight outside of a club during which he went looking for but could not locate his gun. Albert Vela Garcia, a fellow MS-13 member, ultimately found the gun and shot at their rivals while fleeing. Gavidia then helped Vela Garcia paint the car in which he had fled to disguise the bullet hole from the altercation.

## II.

Appellants were indicted along with thirty-three codefendants in May 2015. Before trial, Sosa and Gavidia unsuccessfully moved for severance because the charges against them, unlike those against Zelaya and Ordonez-Vega, did not involve murder.

6

Ordonez-Vega also unsuccessfully moved to exclude testimony from two New York police officers about his gang affiliation.

Of the thirty-seven indicted defendants, Appellants alone proceeded to trial. Several codefendants agreed to testify against Appellants at trial as cooperating government witnesses. The jury heard evidence over five days in early April 2016. Sergeant Samuel Arnold of the Los Angeles Police Department testified about the history and evolution of MS-13 nationally and internationally, and William Hastings, a gang intelligence officer in the Charlotte-Mecklenburg Police Department, testified about MS-13's activity in Charlotte. Cooperating witnesses testified to the gang affiliations of Zelaya, Ordonez-Vega, Sosa, and Gavidia. Pena, a cooperating witness, testified as an eyewitness to Ordonez-Vega's murder of Navarro-Hernandez. Maradiaga testified about Sosa's shooting incident. Vela Garcia, another cooperating witness, testified about Gavidia's gang activities, including the shootouts with rival gangs. Zelaya testified, asserting innocence. Ordonez-Vega testified, maintaining that he shot Navarro-Hernandez in self-defense.

On the third day of trial, Sosa moved for a mistrial based on a witness's reference to an uncharged MS-13 murder during her testimony establishing Sosa as a gang member. At the close of trial, all four Appellants moved for a judgment of acquittal based on insufficient evidence. The court denied these motions, and after two days of deliberation the jury returned a guilty verdict on all counts on April 12, 2016. Gavidia moved for a new trial following the verdict; his motion was denied.

These appeals followed.

7

III.

Appellants raise several challenges to their convictions. All four challenge the district court's denial of their Rule 29 motions for acquittal. *See* Fed. R. Crim. P. 29. In addition, Sosa and Gavidia challenge the district court's refusal to sever their trials and denial of their motions for new trials. Ordonez-Vega challenges the admission of certain evidence, and Sosa challenges certain jury instructions and seeks a new trial based on the cumulative effect of various alleged errors. Gavidia also challenges his sentence. We address each issue in turn.

A.

All four Appellants challenge the district court's denial of their motions for acquittal under Rule 29. *See id.*

We review a district court's denial of a motion for acquittal de novo. *United States v. Kellam*, 568 F.3d 125, 132 (4th Cir. 2009). Denial is proper where, viewed in the light most favorable to the prosecution, substantial evidence supports a guilty verdict. *United States v. Smith*, 451 F.3d 209, 216 (4th Cir. 2006). Substantial evidence is evidence sufficient for a reasonable jury to find proof beyond a reasonable doubt of each element of the charged offense. *Id.* In evaluating the sufficiency of evidence, "[w]e don't consider the credibility of witnesses." *United States v. Burfoot*, 899 F.3d 326, 334 (4th Cir. 2018).

8

1.

Zelaya and Gavidia argue that there was insufficient evidence to support their RICO convictions. We have held that a RICO conviction under 18 U.S.C. § 1962(d) requires proof that: (1) "an enterprise affecting interstate commerce existed;" (2) "each defendant knowingly and intentionally agreed with another person to conduct or participate in [its] affairs;" and (3) "each defendant knowingly and willfully agreed that he or some other member of the conspiracy would commit at least two racketeering acts." *United States v. Cornell*, 780 F.3d 616, 621 (4th Cir. 2015) (citation and internal quotations omitted). A "defendant need not have a managerial role in an enterprise to be convicted." *United States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012).

Gavidia argues that there was insufficient evidence to establish the first element of his RICO conviction. To the contrary, however, ample evidence demonstrated that MS-13 is an enterprise with at least a de minimis effect on interstate commerce. *See Cornell*, 780 F.3d at 622–23 (finding that evidence that an enterprise had a de minimis effect on interstate commerce sufficed to satisfy jurisdictional requirements under RICO); *see also United States v. Palacios*, 677 F.3d 234, 248-50 (4th Cir. 2012) (rejecting a sufficiency challenge to evidence that MS-13 is a racketeering enterprise). Here, the government introduced Sergeant Arnold's expert testimony about the scale, structure, symbology, and rules of MS-13 nationally and internationally and the testimony of Detective Hastings about its history in Charlotte, North Carolina specifically. Cooperating witnesses testified repeatedly and consistently about the "rules" of the gang. Pena also testified that he and Gavidia sold cocaine as part of this enterprise. This was more than sufficient to

9

prove the existence of MS-13 as an enterprise with at least a de minimis effect on interstate commerce within the reach of the RICO statute.

Gavidia and Zelaya each challenge the sufficiency of the evidence on the second and third elements of their respective RICO convictions. However, the government presented more than sufficient evidence to show that both were MS-13 members who agreed to commit multiple overt acts in furtherance of the conspiracy. This evidence included testimony from cooperating witnesses that Gavidia and Zelaya were MS-13 members who repeatedly fought rivals on behalf of the gang. For example, MS-13 members Vela-Garcia and Osler Anuar Portillo-Lara testified that they and Gavidia engaged in multiple gunfights with rival gang members at clubs in and around Charlotte. Similarly, Pena testified that he repeatedly fought rival gang members and taxed drug dealers with Zelaya. Gavidia and Zelaya attack the credibility of these witnesses in their sufficiency challenges, but this is not a basis for acquittal. *See Burfoot*, 899 F.3d at 334 (noting that "[w]e don't consider the credibility of witnesses" on appeal of a Rule 29 motion). Accordingly, we affirm.

2.

Zelaya, Ordonez-Vega, and Sosa argue that there was insufficient evidence as a matter of law to support their VICAR convictions, and, in consequence, the § 924 convictions predicated on their VICAR offenses. To sustain a VICAR conviction under 18 U.S.C. § 1959 the government must prove that: (1) there was a RICO enterprise; (2) it "was engaged in racketeering activity as defined in RICO;" (3) "the defendant in question

10

had a position in the enterprise;" (4) "the defendant committed the alleged crime of violence;" and (5) "his general purpose in so doing was to maintain or increase his position in the enterprise" (the "purpose" element). *United States v. Fiel*, 35 F.3d 997, 1003 (4th Cir. 1994) (citation omitted).

Zelaya's sufficiency challenge regarding membership fails for reasons described above. *See Fiel*, 35 F.3d at 1003 ("The legislative history of the [VICAR] statute indicates that 'enterprise' in this section and in RICO are intended to 'have the same scope.'") (citation omitted). His sufficiency challenge regarding the murder similarly fails. His confession to police officers, in which he demonstrated familiarity with the murder scene, as well as ballistics evidence matching a shell casing from the scene to a firearm that Zelaya attempted to abandon, provide sufficient evidence that he shot Ibarra.

Zelaya also challenges the sufficiency of the evidence that he committed the shooting for the purpose of maintaining or increasing his position in the enterprise. Ordonez-Vega and Sosa challenge their convictions on the same basis.

The government need not show any "nexus between the act of violence and the racketeering activity" to prove that a defendant committed a violent crime "in order to maintain or increase his position" in a racketeering enterprise. *Fiel*, 35 F.3d at 1005. The government need only establish that "the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." *Id.* at 1004 (citation omitted). A defendant may be convicted under VICAR even if maintaining or increasing his position in a racketeering enterprise is not his "only or

11

primary concern" in carrying out a violent crime. *United States v. Tipton*, 90 F.3d 861, 891 (4th Cir. 1996) (citation omitted).

Evidence at trial that Zelaya had a gang-related purpose included Zelaya's statement in his confession that he believed Jose Ibarra to be a rival gang member, his testimony at trial that Steven Ibarra was a rival gang member who along with Jose Ibarra had threatened his friend, and testimony from a cooperating witness that he bragged about the killing to bolster his position in MS-13 after the event. This is sufficient evidence to allow a jury to infer a gang-related motive, and so it satisfies the "purpose" element. *See United States v. Umana*, 750 F.3d 320, 335 (4th Cir. 2014) (finding that the "motive element" of § 1959 could be satisfied "if the [gang] member returned to mafia headquarters to boast about his exploits with a mind toward advancement").

For similar reasons, Ordonez-Vega's sufficiency challenge also fails. Evidence indicates that Ordonez-Vega was with fellow MS-13 members, in MS-13 territory, when he killed Navarro-Hernandez, who he perceived to be a member of a rival gang. This suffices to satisfy the "purpose" element because it provides a reasonable basis for inferring that Ordonez-Vega believed his fellow gang members may have expected him to carry out the shooting. *See Tipton*, 90 F.3d at 891 ("[E]vidence suffices if from it a jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise.") (citation and internal quotations omitted). Because Ordonez-Vega sought acquittal on the § 924 charge solely on the basis that there was insufficient evidence to support his VICAR conviction, his challenge to that conviction also fails.

12

Only Sosa's sufficiency challenge requires a more complex inquiry. The shooting on which Sosa's VICAR and § 924 convictions were predicated was not conducted alongside other MS-13 gang members and was not directed against rival gang members. However, for purposes of assessing whether it was permissible to allow a jury to infer that the shooting was "expected of" Sosa by reason of his position in MS-13, or done in order to "maintain" that position, the combination of the shooting's nature as a grossly disproportionate retaliation to a public slight and Sosa's after-the-fact engagement of a fellow MS-13 member to help him manage the consequences of the crime by directing Maradiaga to leave town suffice to permit the jury to infer a gang-related motive. In particular, the excessive nature of the response, which was objectively apparent and involved Sosa shooting nearly a dozen rounds from an assault rifle at the victims, suggests a motive of making a statement rather than merely exacting payback. While we agree with the district court that "not every violent crime is necessarily an MS-13 crime," J.A. 1126, we also agree that, looking cumulatively at the circumstances present in this case, there was sufficient evidence for the question to go to the jury. We therefore affirm Sosa's convictions.

B.

Sosa also seeks to reverse his VICAR and § 924 convictions on the ground that the jury was not instructed on the "purpose" element of a VICAR offense. However, Sosa's contention is factually incorrect. The district court instructed the jury that it was required to find the elements of a VICAR offense beyond a reasonable doubt in order to convict

13

Sosa of that offense. J.A. 1462–63. Along with this instruction, the district court incorporated by reference the definition of a VICAR offense that it had previously used to instruct the jury on the VICAR charge against Zelaya. *See* J.A. 1463 ("I have previously defined . . . 'murder in aid of racketeering' for you and I instruct you to use th[at] definition[] here."). The district court correctly defined the "purpose" element in its jury instructions as requiring the jury to find "[t]hat the defendant's purpose in committing the murder was to maintain or increase position in the enterprise." J.A. 1453. Although the district court would not have been remiss to expressly reiterate this instruction in reading the charge against Sosa in light of his sufficiency challenge, it nevertheless committed no error.

## C.

Ordonez-Vega challenges the admission of testimony from two New York police officers who encountered him in New York in 2002 and 2004 in connection with gang-related policing. The officers testified that they saw Ordonez-Vega's gang tattoos and that he admitted that he was a member of MS-13. Ordonez-Vega argues that this is impermissible "bad acts" evidence that should have been excluded under Rule 404(b). Fed. R. Evid. 404(b). This argument misfires.

We review the admission of evidence for abuse of discretion. *United States v. Basham*, 561 F.3d 302, 325 (4th Cir. 2009). Rule 404(b) sets out a detailed framework for the admission of evidence regarding a defendant's prior bad acts. Fed. R. Evid. 404(b). However, Rule 404(b) does not apply to evidence introduced to prove a

14

substantive element of the offense charged. *Palacios*, 677 F.3d at 244–45. Here, the government had to prove that Ordonez-Vega was a member of MS-13 as an element of its RICO and VICAR charges. It submitted the contested evidence for that narrow purpose, and therefore, the evidence is not subject to a Rule 404(b) analysis. We find no error here.

### D.

Appellants Sosa and Gavidia both argue that the district court erred in refusing to sever their trials from the trials of Zelaya and Ordonez-Vega. In general, defendants who are indicted together are tried together. *United States v. Dinkins*, 691 F.3d 358, 368 (4th Cir. 2012). We review a district court's denial of a motion to sever for abuse of discretion. *Id.* at 367. Defendants must show clear prejudice arising from a joint trial to establish an entitlement to reversal of their convictions. *Id.* at 368.

Sosa and Gavidia contend that they were prejudiced because they had "markedly different degrees of culpability" from Zelaya and Ordonez-Vega, who were charged with murder, thus "prevent[ing] the jury from making a reliable judgment about guilt or innocence." *See Zafiro v. United States*, 506 U.S. 534, 539 (1993). This argument clearly fails with respect to Sosa, who was charged with attempted murder. Sosa shot repeatedly into a moving vehicle with an assault rifle in an attack on its occupants. That conduct does not involve "markedly different" culpability from the murders underlying Zelaya's and Ordonez-Vega's charges.

Gavidia, who was also an active participant in multiple gang shootings, makes general criticisms of the breadth of RICO liability and points to the absence of a common factual nexus among the Appellants' charged conduct. While these points may suggest that the efficiency gains generally presumed to arise from indicting and trying coconspirators together were absent in this case, that is not the same as showing the "clear prejudice" required to warrant reversal. *See Dinkins*, 691 F.3d at 368. Accordingly, we affirm the district court's denial of Sosa's and Gavidia's motions to sever.

E.

Sosa and Gavidia each requested a mistrial, and their requests were denied. We review a district court's denial of a motion for mistrial for abuse of discretion. *United States v. Wallace*, 515 F.3d 327, 330 (4th Cir. 2008). We reverse "only under the most extraordinary of circumstances." *Id.* (citing *United States v. Dorlouis*, 107 F.3d 248, 257 (4th Cir. 1997)).

Sosa's argument is based on the testimony of Maria Rodriguez, a government witness who testified about an incident in which Sosa threatened her son. The government introduced this testimony in order to demonstrate Sosa's MS-13 membership. Rodriguez testified that Sosa pulled up to her in a car with other gang members and told her that she would cry for her son like she cried for "Hugo." When asked who Hugo was, Rodriquez explained that Hugo was "the guy they had killed

16

before." J.A. 677. It was unclear whether "they" referred to Sosa and his companions in the car or to MS-13 generally.

Sosa contends that the government intentionally solicited this testimony and that the testimony prevented the jury from making "individual guilt determinations" about the crime charged. *United States v. West*, 877 F.2d 281, 288 (4th Cir. 1989). However, the record does not indicate any effort to sow confusion about which crimes Sosa stood accused of. As the district court noted at trial, it was proper for the government to ask Rodriguez to explain what she understood Sosa to be saying to her. The government did not question Rodriguez any further about the uncharged murder and did not refer to it again during the trial. Rather, it focused its arguments and evidentiary presentation on the shooting involving Maradiaga, and Sosa has not pointed to anything else in the record indicating juror confusion about which crime was at issue at trial. Furthermore, at Sosa's request, the district court included a limiting instruction in the jury charge at the end of trial, stating that the defendants were "not on trial for any act, conduct, or offense not alleged in the indictment." J.A. 1316. Jurors are presumed to understand and follow instructions. *Tipton*, 90 F.3d at 893. Under these circumstances it was well within the district court's discretion to not declare a mistrial.[1]

Gavidia invokes the testimony of Sergeant Arnold and Detective Hastings about MS-13 graffiti in Charlotte and the admission of evidence from his Facebook page to

---

[1] Because we find no error in the trial proceedings, we need not address Sosa's contention about the "cumulative" effects of harmless errors.

argue for a mistrial. Gavidia argues that the government's use of this evidence to prove that MS-13 is a structured RICO enterprise of which Gavidia was a member was, in fact, a generalized indictment of Central Americans. However, this evidence was necessary to prove elements of the RICO offense and was properly admitted by the district court. Gavidia has not articulated a basis for departing from our practice of allowing expert testimony on gang communications, structures, and practices. *See Palacios*, 677 F.3d at 243 (construing gang expert's testimony as admissible and finding that it did not violate the Confrontation Clause); *United States v. Ayala*, 601 F.3d 256, 274–75 (4th Cir. 2010) (same). Consequently, he cannot show that he is entitled to a mistrial.

F.

Gavidia's presentence report recommended that he be sentenced to the RICO statutory maximum sentence of 240 months in prison based on a total offense level of 38. The district court granted a downward variance, issuing a below-guidelines sentence of 216 months in prison. Gavidia challenges the reasonableness of his sentence, which we review for abuse of discretion. *See United States v. Susi*, 674 F.3d 278, 282 (4th Cir. 2012).

We presume that sentences within or below the guidelines range are reasonable. *Id.* at 289. When reviewing a sentence for reasonableness, we consider both substantive reasonableness, considering the totality of the circumstances, and procedural reasonableness, "ensur[ing] that the district court committed no significant procedural error," such as miscalculating the sentencing guidelines, failing to consider the § 3553(a)

18

criminal and personal history factors, or selecting a sentence based on erroneous facts. *Susi*, 674 F.3d at 282.

Here, Gavidia identifies nothing that would overcome this presumption. Gavidia's sentence was substantively reasonable. The district court properly considered Gavidia's criminal and personal history under 18 U.S.C. § 3553(a), which instructs the court to consider "the history and characteristics of the defendant" in determining a sentence. It referred to Gavidia's difficult childhood and to his good conduct in prison, including his assistance of a guard with an inmate who attempted suicide, in providing a downward variance from the statutory maximum sentence.

Furthermore, no procedural errors affected Gavidia's sentence. The Sentencing Guidelines for RICO offenses set defendants' base offense levels by referring to crimes committed as part of the conspiracy.[2] Gavidia's presentence report properly relied on "attempted murder" from the August 2013 shooting in which Gavidia was involved to set his base offense level. The shooting was within the scope of MS-13's criminal activities, in furtherance of them, and reasonably foreseeable in light of them, so it constituted a crime committed as part of the conspiracy. *See* U.S.S.G. § 1B1.3(a)(1)(B).

---

[2] Gavidia challenges the use of multiple count guidelines, but their use is explicitly anticipated in the sentencing guidelines for racketeering convictions. *See* U.S.S.G. § 2E1.1(a)(2) (defining the "Base Offense Level" for RICO charges to be "the offense level applicable to the underlying racketeering activity"); *id.* cmt. n.1 (noting that "[w]here there is more than one underlying offense," the district court should "treat each underlying offense as if contained in a separate count of conviction").

Gavidia also challenges the district court's decision not to apply a mitigating adjustment for his allegedly "minimal" involvement in the shooting. The court acted within its discretion in considering Gavidia's role in MS-13, both generally and in the August 2013 shooting specifically, and declining to reduce Gavidia's sentence on this basis.

Because Gavidia points to nothing to reverse the presumption of reasonableness attaching to his sentence, s*ee Susi*, 674 F.3d at 282, we affirm.

IV.

For the reasons stated above, the convictions are

*AFFIRMED.*

FLOYD, Circuit Judge, concurring in part and dissenting in part:

I agree with my colleagues in the majority that we should uphold the convictions of appellants Miguel Zelaya, Luis Ordonez-Vega, and William Gavidia for the reasons stated in the majority opinion. However, I do not agree that there was sufficient evidence to support appellant Jorge Sosa's conviction of violent crimes in aid of racketeering ("VICAR"). Therefore, I must dissent from the majority's conclusion in Part III(A)(2) that the district court correctly denied Mr. Sosa's motion for acquittal.

The majority correctly lays out the elements required to obtain a VICAR conviction under 18 U.S.C. § 1959. The fourth and final element, known as the "purpose element," is at the heart of Sosa's appeal. Under the purpose element, a defendant may be convicted of violating VICAR only if the government proves that he committed a violent act "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity . . . ." 18 U.S.C. § 1959(a). To show that the defendant had the requisite purpose, the government must produce evidence from which "the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership."* *United States v. Fiel*, 35 F.3d

---

* Activity showing the requisite purpose "could occur before commission of a violent crime covered by the statute—for example if a mafia boss instructed a member to commit murder or else be cast out of the organization—or after commission of a violent crime—for example, if the member returned to mafia headquarters to boast about his exploits with a mind toward advancement." *United States v. Umana*, 750 F.3d 320, 335 (4th Cir. 2014).

997, 1004 (4th Cir. 1994) (quoting *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992)).

The government did not produce such evidence regarding Sosa's violent acts. The shooting underlying Sosa's VICAR conviction was not conducted alongside other MS-13 gang members and was not directed against rival gang members. The residence where the dispute originated was not affiliated with any gang. There is no evidence that Sosa picked a fight with his victim at the behest of a fellow MS-13 member or boasted to any gang members about the shooting after it occurred. There is simply not enough evidence for a jury to "properly infer" a connection between the crime and the criminal enterprise as required to support a VICAR conviction.

We have never held that the government can satisfy the purpose element with so little evidence. For example, in *United States v. Umana*, the evidence showed that the defendant, after killing two victims "for their failure to respect his gang," "boasted to his fellow MS-13 members about the murders." 750 F.3d 320, 335 (4th Cir. 2014). We stated that this evidence was enough to satisfy the purpose element. *Id.* at 336. In *United States v. Tipton*, the defendant recruited a fellow member of a drug-trafficking enterprise to help him seek vengeance for a purely personal grievance. 90 F.3d 861, 891 (4th Cir. 1996). Although "the evidence clearly established private revenge as [the defendant's] primary purpose," we reasoned that the evidence "also supported a finding that once [the defendant] had enlisted the aid of his fellow enterprise members in his behalf," he acted with the *additional* purpose of "furthering . . . the enterprise's policy of treating affronts

22

to any of its members as affronts to all . . . ." *Id.* Thus, we held that the government had satisfied the purpose element.

In contrast to *Umana* and *Tipton*, Sosa neither bragged about his violent act to fellow gang members nor enlisted the aid of fellow gang members in committing the act. There is no indication that his motive for or method of carrying out the shooting was gang-related in any way.

The majority's two asserted connections between the crime and the enterprise are unpersuasive. First, the majority makes much of the fact that after the shooting, another MS-13 member, "Chelito," called Sosa's cousin who participated in the shooting and told him to leave town. But there is no evidence that Sosa directed Chelito to make this call, and the call itself reveals nothing about Sosa's motive for committing the crime. Second, the majority reasons that the "excessive nature of the response . . . suggests a motive of making a statement." The majority may indeed believe that the act at issue here was disproportionately violent, but to say that this disproportion "suggests a motive of making a statement" looks more like speculation than a proper inference. Such speculation has no place in a criminal trial.

There is no evidence tying Sosa's crime to his gang involvement. For that reason, I would reverse the district court's denial of Sosa's motion for acquittal. By affirming Sosa's conviction, the majority lightens the government's evidentiary burden to an extent unsupported by our precedent. Indeed, I believe the majority comes perilously close to holding that an act of violence by a gang member is gang-related by default, which robs

23

the purpose element of any force or authority.  I cannot join the majority on this point, and therefore, I respectfully dissent from the affirmance of Sosa's conviction.