**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-4823**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

SEAN ATH,

Defendant – Appellant.

Appeal from the United States District Court for the District of South Carolina, at Spartanburg. Timothy M. Cain, District Judge. (7:16-cr-00776-TMC-2)

Argued: December 10, 2019                    Decided: February 21, 2020

Before GREGORY, Chief Judge, NIEMEYER, and HARRIS, Circuit Judges.

Affirmed by published opinion. Chief Judge Gregory wrote the opinion, in which Judge Niemeyer and Judge Harris joined.

**ARGUED**: Louis H. Lang, CALLISON, TIGHE & ROBINSON, LLC, Columbia, South Carolina, for Appellant. Leesa Washington, OFFICE OF THE UNITED STATES ATTORNEY, Greenville, South Carolina, for Appellee. **ON BRIEF**: Sherri A. Lydon, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.

GREGORY, Chief Judge:

Sean Ath challenges three drug-related convictions following a jury trial, arguing the evidence at trial was insufficient to convict him on each. The district court denied Ath's motion for judgment of acquittal as to all counts. Because we find the trial evidence sufficient to support the three convictions, we affirm.

I.

A grand jury charged Ath and six others in a five-count indictment. Ath's co-defendants included his brother, Soueth Ath ("Soueth"); his son-in-law, Virig Chheng; his nephew, Anthony Pan; and Vilay Phabmisay, who testified at Ath's trial. Three counts of the indictment pertained to Ath: conspiracy to possess with intent to distribute and to distribute 50 grams or more of methamphetamine (Count One); use of a communication facility—the United States mail—to facilitate the commission of a felony under the Controlled Substances Act (Count Two); and possession with intent to distribute and distribution of 50 grams or more of methamphetamine (Count Three).[1] Soueth and Ath

---

[1] Counts Two and Three also charged Ath with aiding and abetting. As set forth herein, we find the trial evidence sufficient to show Ath's participation in both crimes as a principal, so we need not consider the alternative theory of aiding and abetting. *See United States v. Ealy*, 363 F.3d 292, 298 (4th Cir. 2004). Nevertheless, the record supports aiding and abetting, as the circumstances surrounding the package transfer demonstrate Ath's knowing association with and participation in a criminal venture. *See United States v. Burgos*, 94 F.3d 849, 873 (4th Cir. 1996) (noting evidence used for a conspiracy conviction may also prove aiding and abetting).

2

were tried together. We begin our review by examining the relevant evidence the government presented at trial.

## A.

A United States Postal Inspector named Michael Nicholson testified at trial that the FBI contacted him in March 2014 to investigate a possible drug conspiracy in Spartanburg, South Carolina. The investigation included several houses on Black Street in Spartanburg, including Ath's home located at 199 Black Street ("Ath's Residence").[2] Upon learning of the investigation, Nicholson recalled that in October 2012, he had seized a parcel containing three pounds of marijuana destined for Ath's Residence. The parcel had been addressed to Bun Chan, from Sammie Chheng at 429 South Backer Avenue, Apartment 202, in Fresno, California.[3] On or around October 14, 2014, Nicholson intercepted a package shipped from Daniel S. at 5802 Stacy Street in Bakersfield to Sophie S. at 203 Black Street. Chheng's fingerprints were found on the package, which contained a dog food container holding six pounds of marijuana.

Nicholson next intercepted a package from Fresno on October 23, 2014, destined for someone named Sam Chan at Ath's Residence. The package contained 1,356.4 grams of marijuana. On October 30, Nicholson seized a package addressed to Amanda Adams at 203 Black Street, from David Watson in Bakersfield. Nicholson found a dog food

---

[2] South Carolina Department of Motor Vehicle records identified 199 Black Street as Ath's address beginning in January 2005.

[3] In 2012, Soueth, Ath's brother, lived in Apartment 201 at 429 South Backers Avenue in Fresno. Nicholson testified it "is actually quite common" for individuals transporting drugs through the mail to use a slight variation of a true address. J.A. 126.

container filled with 3,112.8 grams of marijuana. Then, on June 10, 2015, Nicholson intercepted a package from Union City, California, intended for Hong Ho at 203 Black Street. It contained 2,238.6 grams of marijuana in plastic dog food containers.

Phabmisay, who lived in Bakersfield at the time of his arrest, testified at trial that Soueth and Chheng lived near him in California for several years before relocating to South Carolina in 2015. Phabmisay further testified that Soueth had grown marijuana in California and shipped it—in dog food containers—through the Postal Service to Soueth's family members in South Carolina for distribution.

Phabmisay also testified that beginning in April 2016, Chheng and Soueth, who had relocated to South Carolina by this point, recruited him to ship methamphetamine to South Carolina for distribution. Phabmisay "was told there was an operation going on of shipping methamphetamine from California to South Carolina," with Pan, Ath's nephew, shipping the drugs from California before Phabmisay got involved. J.A. 575. At Chheng and Soueth's direction, Phabmisay opened several bank accounts, including a Bank of America account under "Vilay Phabmisay Gardening Services" ("Bank of America Account"). J.A. 583. After Phabmisay provided the account information to Soueth and Chheng, individuals in South Carolina—some Phabmisay knew and some he did not—deposited money into these accounts.

Phabmisay withdrew funds nearly immediately after they were deposited and gave the money to Pan, who purchased the methamphetamine.[4] Phabmisay then shipped the

---

[4] Phabmisay indicated the going rate for a pound of methamphetamine at the time was $3,500 to $4,500.

4

methamphetamine to South Carolina through the Postal Service. He estimated that he had shipped packages containing one to four pounds of the drug at least every other week, amounting to about 18 packages total between April and September 2016. Chheng and Soueth provided the destination addresses for the shipments, but, per their instructions, Phabmisay "made up" the names and return addresses. J.A. 602. In fact, "[t]he only real thing on the label would be where the package is getting shipped to." *Id.* Phabmisay testified that he had "heard about" Ath and "heard he was living" in South Carolina but could not verify whether he sent drugs to Ath because he was not told who was on the receiving end of his shipments. J.A. 625.

Nicholson intercepted two packages containing methamphetamine in April and May of 2016, both adhering to the pattern set forth in Phabmisay's testimony. Specifically, following the quick withdrawal of cash deposits into the Bank of America account, the packages were shipped to apparently fictitious individuals at addresses on Black Street.

Finally, on September 2, 2016, Nicholson seized a package that became the subject of the controlled delivery central to this appeal. The parcel, which Phabmisay admitted he sent, was addressed to Riley Ridal at Ath's Residence, from Michael Ridal in Arvin, California. It contained two pounds of methamphetamine. On September 7, Nicholson, the FBI, and the Spartanburg police used about half of the seized methamphetamine (445 grams) to stage a controlled delivery.

Nicholson acted as a mail carrier to deliver the package to Ath's Residence. When Nicholson arrived, he knocked on the door and, receiving no response, started to walk around to the back of the house. An individual sitting in a vehicle parked outside of 203

5

Black Street yelled to Nicholson, "he is coming." J.A. 201. Nicholson then saw someone—who turned out to be Ath—walking toward him from the driveway of 210 Black Street. Once Ath arrived, Nicholson asked if Ath "was having a good day, or something to that effect." J.A. 204. According to Nicholson's testimony, Ath looked at the package but did not say anything when Nicholson handed it to him, despite the fact that it was addressed to Riley Ridal.

Police conducted video surveillance of the controlled delivery from a nearby van and the video, which was shown at trial, is part of the record before us. The video depicts Ath, after receiving the package from Nicholson, walking to his front door. He places the package on a chair on the front porch and appears to search for his keys before opening the door. He then picks up the package and walks inside. After about a minute, Ath leaves his house without the package, apparently without locking the door, and walks toward 210 Black Street. Within minutes, a silver car approaches Ath's Residence.

An individual later identified as Chheng exits the vehicle, steps onto Ath's porch, and "walk[s] directly inside without looking for keys." J.A. 347. Ath then returns in a truck and walks into his house without using a key. While Chheng remains inside, Ath alternates between standing on his front porch and going inside the house. After several minutes, with Ath sitting on the porch, Chheng exits Ath's Residence and carries to his car a bag that Nicholson later confirmed contained the box of methamphetamine he had delivered to Ath. As Chheng begins to drive away, law enforcement vehicles approach his car. At this point, Ath leaves his porch and tries to walk in the opposite direction as officers approach him.

6

On September 6, the day before the controlled delivery, a female had used Ath's driver's license to make a $3,200 deposit into the Bank of America Account from a Spartanburg branch. On September 7, following the controlled delivery, Ath was able to present his driver's license to officers. After providing *Miranda* warnings, an FBI agent and a police officer interviewed Ath.[5] Although the officers questioned him in English, which is not his first language, they testified that Ath indicated he understood, answered questions appropriately, and did not ask for questions to be repeated. During the interview, Ath made several statements that were proven false by the video surveillance. First, Ath stated that when he received the package, he left it on his porch. Then, he claimed his son-in-law picked up the package from his porch. Finally, Ath reversed course and reported he took the package inside but brought it back to the porch, where his son-in-law retrieved it.

## B.

At the close of the government's evidence, Ath moved for judgment of acquittal. The district court denied his motion, and the jury found Ath guilty on all three counts. Following the verdict, Ath renewed his motion for acquittal, which the district court denied. The court sentenced Ath to 151 months in prison. This appeal followed.

## II.

Ath challenges the district court's denial of his motion for acquittal pursuant to Federal Rule of Criminal Procedure 29, a decision we review de novo. *United States v.*

---

[5] Additionally, Nicholson asked Soueth if Ath was involved in receiving controlled substances through the mail, to which Soueth responded, "I don't know." J.A. 215.

*Zelaya*, 908 F.3d 920, 925 (4th Cir. 2018). Denial of such a motion "is proper where, viewed in the light most favorable to the prosecution, substantial evidence supports a guilty verdict." *Id.* Substantial evidence means the evidence was sufficient for a reasonable jury to find proof beyond a reasonable doubt of each element of each offense. *Id.* In undertaking this analysis, "[t]he jury, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented." *United States v. Palacios*, 677 F.3d 234, 250 (4th Cir. 2012). We consider the evidence "in cumulative context," rather than "in a piecemeal fashion." *Burgos*, 94 F.3d at 863. While this standard presents a "heavy burden" for defendants, reversal is appropriate when "the prosecution's failure is clear." *United States v. Pinson*, 860 F.3d 152, 161 (4th Cir. 2017).

## A.

Ath challenges the knowledge element of his three convictions. We first consider his conviction for conspiracy to possess with intent to distribute and distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846 (Count One). To prove this conspiracy beyond a reasonable doubt, the government was required to show: "(1) an agreement to distribute and possess [methamphetamine] with intent to distribute existed between two or more persons; (2) the defendant knew of the conspiracy; and (3) the defendant knowingly and voluntarily became a part of this conspiracy." *United States v. Hackley*, 662 F.3d 671, 678 (4th Cir. 2011) (internal quotation marks omitted). Ath does not contend there was insufficient evidence to establish a conspiracy; instead, he argues the government failed to show he knew about the conspiracy and that he knowingly and voluntarily became a part of it.

8

Once the government has proven a conspiracy exists, "the evidence need only establish a slight connection between the defendant and the conspiracy to support conviction." *United States v. Brooks*, 957 F.2d 1138, 1147 (4th Cir. 1992). The word "slight," however, "does not describe the *quantum* of evidence that the [g]overnment must elicit in order to establish the conspiracy, but rather the *connection* that the defendant maintains with the conspiracy," which still must be proven beyond a reasonable doubt. *Burgos*, 94 F.3d at 861. In other words, a defendant must know a conspiracy's "essential object," but he does not need to know every detail of the conspiracy. *Hackley*, 662 F.3d at 679. That is, he "need not know all of his coconspirators, comprehend the reach of the conspiracy, participate in all the enterprises of the conspiracy, or have joined the conspiracy from its inception." *Burgos*, 94 F.3d at 861. Indeed, "a defendant may be convicted despite having played only a minor role in the overall conspiracy." *Brooks*, 957 F.2d at 1147.

In Ath's case, there is sufficient evidence to show that he knowingly became involved in the drug conspiracy. As an initial matter, prior to the controlled delivery, Nicholson intercepted two packages of marijuana addressed to Ath's Residence, one in 2012 and one in 2014. A jury could reasonably infer Ath's involvement with those packages from Phabmisay's testimony. Phabmisay testified that before 2015, Soueth grew marijuana in California and shipped it to family members in South Carolina. And the 2012 parcel Nicholson intercepted en route to Ath's Residence was from a return address that nearly matched Soueth's address in Fresno at the time. A reasonable jury could find that the marijuana shipments form part of a pattern and practice that continued with the methamphetamine package Nicholson intercepted on its way to Ath's Residence in 2016.

9

The circumstances of the controlled delivery are critical evidence of Ath's knowledge of the conspiracy, as they exceed mere acceptance of a package for his son-in-law. *Cf. United States v. Rahseparian*, 231 F.3d 1257, 1263 (10th Cir. 2000) (finding the evidence showed that the defendant handled his sons' banking, not his knowledge of their fraudulent business). Ath returned home from a neighboring property to personally accept the package from Nicholson. According to Nicholson, Ath looked at the package, which was not addressed to Ath. Phabmisay testified that Chheng and Soueth provided the destination addresses for drug shipments, but Phabmisay made up names for the addressees—this one being "Riley Ridal." J.A. 205. Despite the package being addressed to a fictitious person, Ath accepted it without question, which speaks to his knowledge of the covert drug conspiracy.

Ath then took the package into his house and left the premises, apparently without locking the door. Within minutes, Chheng appeared and entered Ath's Residence without a key, confirming Ath had left the door unlocked, which a jury may find indicative of Ath's knowledge since Ath had to unlock his door when he initially entered to drop off the package. Ath returned to his house and appeared to simply wait while Chheng remained inside. Taken as a whole, a reasonable jury could determine that Ath's behavior signifies his knowledge of a plan to accept the drugs and hand them off to Chheng, who ultimately emerged from Ath's Residence with the package of methamphetamine and began to drive away with it before law enforcement intervened.

Additionally, on September 6, 2016, Ath's driver's license was used to deposit $3,200 into the Bank of America Account. Ath contends a female made this deposit and

10

there is no evidence he knew anything about it. A reasonable jury, however, could infer his knowledge from the fact that, the very next day, after the controlled delivery, Ath presented his license to officers for identification. Ath further points out that bank records list April 1, 2023, as the expiration date for the license used in the September 6 transaction, while his license actually expires on April 1, 2021. As an initial matter, the jury could find that the bank teller made a clerical error when typing in the expiration date.[6] But in any event, the discrepancy between the dates is insufficient to undermine the other evidence supporting Ath's knowledge.

Ath makes much of the fact that Phabmisay did not know or communicate with him. But Phabmisay did not know all of the individuals involved in the conspiracy in South Carolina, and the law does not require such knowledge. *See Burgos*, 94 F.3d at 861 (noting a conspirator need not know every member of the conspiracy). Phabmisay did testify, however, that he had "heard about" Ath and "heard he was living" in South Carolina. J.A. 625. Although Phabmisay was not told who was on the receiving end of his shipments, he testified that he knew Soueth was shipping drugs to his family in South Carolina, and there is no dispute Ath is Soueth's brother. Together, these pieces of Phabmisay's testimony could contribute to a jury's inference that Ath was knowingly involved in the conspiracy.

Juries may also consider false exculpatory statements as evidence of a defendant's "consciousness of guilt," meaning the defendant knew he was doing something wrong or

---

[6] In fact, Ath's counsel framed the issue this way at oral argument: "There was a *mistake, an error* . . . The expiration date on my client's driver's license is not the same as the expiration date *recorded by the teller*." Oral Arg. at 7:38–48, *United States v. Sean Ath*, No. 18-4823 (4th Cir. Dec. 10, 2019) (emphasis added).

11

illegal, which bears on the issue of knowledge. *See, e.g.*, *United States v. Morales*, 577 F.2d 769, 772–73 (2d Cir. 1978). While such statements alone might be insufficient to establish guilt, *see Rahseparian*, 231 F.3d at 1263, Ath's false statements to police after the controlled delivery, paired with the other evidence in this case, support a finding of guilt. *See United States v. Zandi*, 769 F.2d 229, 235 (4th Cir. 1985) (determining a rational jury could find knowledge of drug possession in part from false exculpatory statements). Ath told police that he placed the package on the porch, rather than taking it inside his home, and that Chheng retrieved it from his porch. Ath asserts his statements were not exculpatory because placing the package on the porch is no different from taking it inside the house. A reasonable jury, however, could perceive the statements—which were proven false by the video—as Ath's attempts to distance himself from the criminal enterprise. And despite Ath's assertion that a language barrier affected his interactions with police, the jury was free to credit the interviewing officers' testimony to the contrary.

Although much of the evidence in this case is circumstantial, "a conviction may rely *entirely* on circumstantial evidence." *United States v. Hassan*, 742 F.3d 104, 139 (4th Cir. 2014) (emphasis added). The circumstances of the controlled delivery, coupled with the intercepted packages previously sent to Ath's Residence, the deposit using Ath's license, and his false exculpatory statements, are sufficient for a reasonable jury to infer Ath's knowing involvement in the conspiracy's operations, which Phabmisay detailed at trial. That Ath may have played a smaller role than some of his coconspirators does not mean his conviction fails. *See Brooks*, 957 F.2d at 1147. Substantial evidence supports Ath's knowing and voluntary connection to the conspiracy—however slight. *See id.* The

12

foregoing evidence, viewed in the light most favorable to the government, was sufficient for a reasonable jury to find proof beyond a reasonable doubt that Ath knew of the conspiracy and knowingly and voluntarily became a part of it.

B.

To sustain Ath's conviction under 21 U.S.C. § 843(b) for use of a communication facility in the commission of a drug felony (Count Two), the evidence must have established that Ath "(1) knowingly or intentionally (2) used a communication facility (3) to facilitate the commission of a drug felony." *United States v. McKenzie*, 396 F. App'x 949, 951 (4th Cir. 2010) (quoting *United States v. Henao-Melo*, 591 F.3d 798, 802 n.5 (5th Cir. 2009)). A "communication facility" encompasses "any and all public and private instrumentalities used or useful in the transmission of writing, signs, signals, pictures, or sounds of all kinds." 21 U.S.C. § 843(b). The statutory definition explicitly includes "mail," the communication facility at issue in this case. *Id.* Ath disputes, however, that the government proved the "knowingly or intentionally" element at trial.

The same evidence that supports Ath's conspiracy conviction also supports his conviction under § 843(b). Ath took concerted steps to accept the package of methamphetamine from Nicholson, apparently a mail carrier, and transfer it to Chheng. After taking the package, which was not addressed to him, Ath placed it inside his house before allowing Chheng to enter his home and retrieve the package. All of this occurred without Ath pausing for a moment or raising a single question, indicating his knowledge of the crime. Ath also lied to police about his actions regarding the package, which is consistent with a guilty conscience. *See Zandi*, 769 F.2d at 235.

13

A reasonable jury could infer from Ath's actions that he knew he was using the mail to transfer controlled substances. Accordingly, viewed in the light most favorable to the government, substantial evidence supports Ath's conviction for use of a communication facility in the commission of a drug felony, including the felonies in Counts One and Three.

C.

Finally, the jury found that Ath violated 21 U.S.C. § 841(a)(1) (Count Three), which requires proof that a defendant (1) possessed a controlled substance; (2) knew of the possession; and (3) intended to distribute the controlled substance.[7] *United States v. Hall*, 551 F.3d 257, 267 n.10 (4th Cir. 2009). Ath concedes he had actual possession of the package containing methamphetamine, meaning he had physical control over it.[8] *See United States v. Penniegraft*, 641 F.3d 566, 572 (4th Cir. 2011). Instead, Ath argues he did not know what was in the package.

Ath's actions surrounding the controlled delivery, along with his false statements to police that he placed the package on the porch for Chheng, form a sufficient basis upon

---

[7] Although Ath does not address it, Count Three also charges distribution of 50 grams or more of methamphetamine. The evidence is sufficient to show that Ath "distributed" the methamphetamine pursuant to the statutory definition because he "delivered" the package to Chheng by transferring it to him. *See* 21 U.S.C. §§ 802(8), (11) (to "distribute" a controlled substance means to "deliver" it, and "delivery" is defined as "the actual, constructive, or attempted transfer of a controlled substance").

[8] Ath neither concedes nor disputes the intent to distribute element, but substantial evidence supports it. Indeed, a large quantity—two pounds—of methamphetamine was shipped to Ath's Residence. *See United States v. Collins*, 412 F.3d 515, 519 (4th Cir. 2005) (listing quantity of drugs as an indicator of intent to distribute). Moreover, Nicholson recalled finding a box of plastic bags when he recovered the bag Chheng carried to his car from Ath's Residence. *See United States v. Fisher*, 912 F.2d 728, 730 (4th Cir. 1990) (noting intent to distribute can be inferred from drug-packaging paraphernalia).

14

which a reasonable jury could infer that Ath knew the package Nicholson delivered contained a controlled substance. We have already established that substantial evidence supports Ath's connection to the drug conspiracy—and that connection relies in part upon his knowledge of the package's contents. Specifically, he accepted the package without question, even though it was not addressed to him, and left it in his unlocked residence. Chheng arrived mere minutes later, followed by Ath, who simply waited while Chheng retrieved the package from inside his home. Moreover, Phabmisay detailed the conspiracy's operation of shipping methamphetamine from California to South Carolina— which included the package of methamphetamine that Nicholson intercepted and used for the controlled delivery to Ath. A reasonable jury, considering all of the facts pertaining to the conspiracy as well as Ath's behavior during and after the delivery, could find that Ath knew the package contained methamphetamine.

Thus, construing the evidence in the light most favorable to the government, a reasonable jury could find beyond a reasonable doubt that Ath knew the package that Nicholson delivered contained methamphetamine.

D.

For each count, the district court found Ath was "at the very least . . . willfully blind to the unlawfulness of his actions." *E.g.*, J.A. 989 (quoting *United States v. McIver*, 470 F.3d 550, 563–64 (4th Cir. 2006)). The government can use willful blindness to satisfy a crime's knowledge requirement by showing the defendant "purposely close[d] his eyes to avoid knowing what was taking place around him." *McIver*, 470 F.3d at 563. This limited doctrine imposes two requirements: "(1) the defendant must subjectively believe that there

15

is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *United States v. Hale*, 857 F.3d 158, 168 (4th Cir. 2017).

We do not believe the record here supports a finding of willful blindness because we cannot identify any *deliberate actions* that Ath took to avoid learning of the conspiracy or the contents of the package that was shipped to his residence. Nevertheless, we may affirm the district court "on any grounds apparent from the record." *United States v. Smith*, 395 F.3d 516, 519 (4th Cir. 2005). For the foregoing reasons, substantial evidence demonstrates Ath's actual knowledge for each count, so we affirm on those grounds.

III.

The trial evidence in this case is sufficient to prove Ath's knowledge for all three counts of conviction. Accordingly, without relying on the willful blindness doctrine, we affirm the district court's denial of Ath's motion for judgment of acquittal as to each count.

*AFFIRMED*

16