**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-4491

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

KEVIN THOMAS SEIGLER,

Defendant – Appellant.

Appeal from the United States District Court for the Western District of Virginia, at Abingdon. James P. Jones, District Judge.  (1:16-cr-00041-JPJ-PMS-5)

Argued:  October 29, 2020                      Decided:  March 3, 2021

Before GREGORY, Chief Judge, AGEE, Circuit Judge, and Stephanie A. GALLAGHER, United States District Judge for the District of Maryland, sitting by designation.

Affirmed by published opinion.  Judge Agee wrote the opinion, in which Judge Gallagher joined. Chief Judge Gregory wrote an opinion concurring in the judgment.

**ARGUED:**  John Edward Davidson, DAVIDSON & KITZMANN, PLC, Charlottesville, Virginia, for Appellant.  Jean Barrett Hudson, OFFICE OF THE UNITED STATES ATTORNEY, Charlottesville, Virginia, for Appellee. **ON BRIEF:**  Thomas T. Cullen, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellee.

AGEE, Circuit Judge:

Kevin Thomas Seigler challenges his conviction and sentence for conspiracy to manufacture, distribute, or possess with the intent to distribute controlled substances or to use a communication facility in committing and causing the facilitation of any felony controlled substance offense, in violation of 21 U.S.C. §§ 841(b)(1)(A), (C), and (E); 843(d); and 846. For the reasons set forth below, we affirm.

I.

Law enforcement in Virginia and Nevada coordinated an investigation into a methamphetamine and oxycodone distribution ring that shipped those controlled substances from Las Vegas to individuals in southwest Virginia for distribution throughout the community. Specifically, law enforcement learned that southwest Virginia residents Richard Kayian and Tracy Allen Callihan frequently purchased controlled substances from Las Vegas resident Stephen Cino for resale in Virginia. In mid-February 2016, as part of their investigation into the Nevada side of this venture, law enforcement obtained a 30-day warrant to wiretap Cino's cell phone.

As a result of that wiretap, law enforcement recorded two telephone conversations between Cino and a man later identified as Seigler.[1] In the first call, placed on March 8,

---

[1] A total of four recorded conversations were introduced into evidence at trial and made available on appeal, but no transcripts were made. The opinion quotes the recording to the best of our comprehension, and accurately reflects the tenor of the conversation even if connective language or word tense is imprecise.

2016, Cino called Seigler and said, "from what I understand, it looks like it's gonna be a deuce,"[2] and that he'd know for sure the next morning. Cino asked if that would be enough notice to plan on meeting midday. Seigler agreed and said that he would call his contact immediately to ensure everything was ready. The next day, Cino called Seigler to confirm that he wanted "two." Seigler indicated that he was prepared to meet any time, and they discussed how long it would take for Cino to arrive at Seigler's location. Cino offered to pick up lunch, and the two men agreed that he would do so at a restaurant near Seigler called The Lodge.[3]

Because they knew where Cino would be before driving to what they believed to be a drug deal, law enforcement decided to conduct physical surveillance. An officer followed Cino from The Lodge to 5708 Calanas Avenue. Cino arrived at approximately 12:20 pm and entered the residence carrying the food in containers from The Lodge. He exited approximately forty-five minutes later carrying a white plastic bag that he placed in the trunk of his car. Law enforcement followed him a short distance before pulling over the vehicle. In a subsequent search, officers found the plastic bag with what they believed to

---

[2] A Government witness testified that in his experience as a law enforcement officer and with this investigation specifically, he suspected that "deuce," in this context, referred to two pounds of methamphetamine. J.A. 299.

[3] The other two recorded phone calls introduced into evidence each took place minutes before the calls Cino placed to Seigler. In each, Cino spoke with coconspirator Callihan to discuss the sale and shipment of the same amount of methamphetamine to Callihan in Virginia. While these calls are salient to understanding the totality of Cino's conduct, we have focused the narrative recited above to what the Government proved about Seigler's knowledge and conduct.

be methamphetamine. Later testing verified the substance to be approximately two pounds of methamphetamine.

Thereafter, law enforcement—who had also continued surveilling the 5708 Calanas Avenue residence—obtained a search warrant for that address. In the interim, they learned that the phone number of the unidentified man on two recorded conversations was registered to Seigler, that Seigler's driver's license listed his address as 5708 Calanas Avenue, and that utilities at the address were listed in Seigler's name.

When police officers executed the warrant that same afternoon, they seized about $17,000 in the master bedroom, $280 from Seigler's person and $1,700 in a home office. They did not locate any methamphetamine, but seized several types of pills, a digital scale, plastic baggies consistent with ones used to repackage controlled substances for sale, and a Verizon cell phone bill in Seigler's name listing the phone number Cino had called. Officers also observed a small amount of marijuana, but did not seize it.

In November 2016, twenty-two individuals were indicted for conspiracy offenses in the United States District Court for the Western District of Virginia. Cino and Seigler were the only named Nevada residents; everyone else resided in southwest Virginia. Seigler was tried by himself; the other defendants pleaded guilty or went to trial in separate proceedings. Seigler was named in Count 1 only, which alleged his participation in a conspiracy to (1) manufacture, distribute, or possess with the intent to distribute methamphetamine, oxycodone, and buprenorphine ("the distribution objective"), and (2) use a communication facility to commit a felony controlled substance offense ("the communications facility objective").

4

Seigler's Virginia trial was originally set for May 2017, but he failed to appear. When law enforcement arrived at 5708 Calanas Avenue the day after Seigler had failed to appear, they observed "the defendant" jump over a wall in the back to flee from them. J.A. 343.[4] Seigler was later apprehended and charged with one count of failure to appear, in violation of 18 U.S.C. § 3146(a) and (b)(1)(A)(1). Seigler pleaded guilty to that offense, but invoked his right to a trial on the conspiracy count. He moved to suppress the recorded telephone conversations, arguing that the affidavits supporting the wiretap warrant for Cino's phone contained intentionally false and misleading representations. The district court denied the motion without holding an evidentiary hearing.

The evidence presented at trial was relatively straightforward. Law enforcement officials testified about the investigation in southwest Virginia, obtaining the wiretap to Cino's phone, the recorded telephone conversations, and the March 9 surveillance and search warrant. The four calls were played for the jury. One Virginia coconspirator, Bradley Allen Chapman, the son-in-law of coconspirator Kayian, testified about how Kayian and Callihan would obtain shipments from Cino and then redistribute them to family and acquaintances in southwest Virginia. Chapman also testified that he would sometimes agree to wire money to individuals in Las Vegas, but that he could not remember

---

[4] Specifically, the trial witness was part of a team seeking to apprehend Seigler at his residence. The witness overheard another "officer yell out, 'Police, let me see your hands.' At which point [they] ran through the house to the back and learned that the defendant had jumped over the back wall." J.A. 343. On cross-examination, the witness acknowledged that he knew Seigler's brother "looks similar to him." J.A. 345. When asked "do you have any way of knowing with the accounts you described his brother could have been part of some of that or not?," the witness replied, "It's possible." J.A. 346.

their names and addresses. While Chapman described the southwest Virginia part of the conspiracy in some depth, he admitted that he had never met or spoken to Cino and that he was not familiar with Seigler's name and had never met or spoken to him.

The jury convicted Seigler of the charged conspiracy, noting on the special verdict form that it found the Government had proven both the distribution objective and the communications facility objective. In addition, the jury found that Seigler participated in a conspiracy involving methamphetamine (not oxycodone) and that the conspiracy involved 500 grams or more of methamphetamine.

Seigler was sentenced at the same time for both the failure-to-appear and the conspiracy convictions, so one pre-sentence report ("PSR") was prepared in advance of the sentencing hearing. After calculating the advisory Guidelines range and listening to the parties' arguments on an appropriate sentence under 18 U.S.C. § 3553(a), the district court sentenced Seigler to a total of 286 months' imprisonment.[5]

Seigler noted a timely appeal, and the Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

II.

On appeal, Seigler raises several issues related to his conviction and sentence: (1) the sufficiency of the evidence to support his conspiracy conviction; (2) the wording of the

---

[5] Seigler was sentenced to 262 months for the conspiracy conviction and to a consecutive term of 24 months for the failure-to-appear conviction because, by statute, the sentence for failing to appear must run consecutively to the term of imprisonment for the underlying offense. 18 U.S.C. § 3146(b)(2).

special verdict form; (3) the veracity of the affidavit supporting the wiretap warrant; (4) the credibility and sufficiency of the testimony supporting the drug-weight finding used to calculate his Sentencing Guidelines range; and (5) the imposition of an offense-level enhancement for obstruction of justice. We address each argument in turn.[6]

## A. Sufficiency of the Evidence

The indictment alleged a multi-object conspiracy, meaning that the Government alleged one conspiracy count that could be based on either of the two charged unlawful objectives: distribution or use of a communications facility. Seigler's first challenge is to the sufficiency of the evidence to support the distribution objective.[7] To prove that offense, the Government was required to show (1) an agreement between two or more persons to distribute and possess with the intent to distribute methamphetamine; (2) Seigler's

---

[6] Seigler also contends the district court should have dismissed two jurors for cause based on concerns of implicit bias that arose during voir dire. Although both jurors indicated that they would be fair and impartial, Seigler asserts the court should have dismissed them for cause because one worked for the Virginia Department of Corrections (and had family employed by it as well), and the other juror's husband was a former prosecutor and had attended high school with two of the coconspirators (not witness Chapman). Seigler did not ask either juror to be struck for cause, so our review would be for plain error. *See United States v. Olano*, 507 U.S. 725, 732–36 (1993). Moreover, in assessing whether error occurred, we review for whether the district court manifestly abused its discretion by not removing these jurors. *United States v. Turner*, 389 F.3d 111, 115 (4th Cir. 2004). Seigler concedes he cannot satisfy this burden, and instead, he urges the Court to adopt a more relaxed standard for assertions of implicit, rather than actual, bias. But it is well-settled that a "panel of this court is bound by prior precedent from other panels in this circuit absent contrary law from an en banc or Supreme Court decision." *Taylor v. Grubbs*, 930 F.3d 611, 619 (4th Cir. 2019) (citation omitted). Accordingly, we do not entertain this argument further.

[7] Seigler does not raise a separate sufficiency challenge to the second object of the conspiracy, but his other challenges impact both objectives, so we must consider this issue at the outset.

knowledge of the conspiracy; and (3) Seigler's knowing and voluntary participation in the conspiracy. *United States v. Burgos*, 94 F.3d 849, 857 (4th Cir. 1996) (en banc). Seigler does not contest that the Government satisfied its burden as to the first element, i.e., that it proved the existence of a conspiracy between Cino and individuals in southwest Virginia. Rather, he challenges the sufficiency of the evidence to prove his knowledge of and participation in that conspiracy.

Given the clandestine nature of distribution conspiracies, we have long recognized that they are usually proven "inferentially and by circumstantial evidence." *United States v. Hickman*, 626 F.3d 756, 763 (4th Cir. 2010) (citation omitted). To prove a specific defendant's connection to a proven conspiracy beyond a reasonable doubt, "the Government need not prove that the defendant knew the particulars of the conspiracy or all of his coconspirators." *Burgos*, 94 F.3d at 858. It is sufficient if the defendant "joins the conspiracy with an understanding of the unlawful nature [of it] and willfully joins in the plan on one occasion" even if he lacks an understanding of its scope or its details. *Id.* (citation omitted). In fact, "upon establishing the conspiracy, only a slight connection need be made linking a defendant to the conspiracy to support a conspiracy conviction, although this connection also must be proved beyond a reasonable doubt." *Id.* at 862.

Our review of the evidence following a jury trial is narrow, and we "*must*" sustain the verdict "if there is substantial evidence, taking the view most favorable to the Government, to support it." *Id.* at 862 (emphasis added and citation omitted). We "may not overturn a substantially supported verdict merely because [we] find[] the verdict unpalatable or determine[] that another, reasonable verdict would be preferable. Rather, we

8

shall reverse a verdict if the record demonstrates a lack of evidence from which a jury could find guilt beyond a reasonable doubt." *Id.* Put another way, reversal is limited "to cases where the prosecution's failure is clear." *Id.* (citation omitted). In considering whether substantial evidence exists, we recognize that credibility determinations, weighing of the evidence, and determining which among "different, reasonable interpretations" of the evidence to believe are all functions left solely to the jury. *Id.* (citation omitted). At bottom, our duty is to determine, "viewing the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the Government, whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt." *Id.* at 863 (citation omitted).

Applying these standards to the trial evidence in Seigler's case leads us to conclude that there is substantial evidence to support his conviction for the distribution conspiracy. While Seigler focuses on evidence that existed in other distribution conspiracies, but is absent in this record, the above standards reinforce that our focus must remain fixed on the sufficiency of the evidence that *is* in the record rather than on what other evidence there *could be*. And in this case the principal evidence against Seigler is the March 9, 2016 sale of two pounds of methamphetamine to Cino. We have repeatedly recognized that evidence of a single buy-sell transaction involving a "substantial quantity of drugs" can support a "reasonable inference" of knowing participation in a distribution conspiracy. *United States v. Mills*, 995 F.2d 480, 485 n.1 (4th Cir. 1993) ("[E]vidence of a buy-sell transaction, when coupled with a substantial quantity of drugs, would support a reasonable inference that the parties were coconspirators."); *see United States v. Allen*, 716 F.3d 98, 103–04 (4th Cir.

9

2013); *United States v. Hackley*, 662 F.3d 671, 679 (4th Cir. 2011). In so holding, we expressly rejected the position adopted by the Seventh Circuit that Seigler relies on to contend that such circumstances can serve *only* as evidence of a buy-sell transaction. *Mills*, 995 F.2d at 485 n.1 (discussing *United States v. Townsend*, 924 F.2d 1385 (7th Cir. 1991), and "declin[ing] to go [as] far" as the Seventh Circuit in holding that a single transaction "(even in large quantities) does not demonstrate an agreement to join a drug distribution conspiracy" because that evidence "is at least relevant (i.e. probative) on the issue of whether a conspiratorial relationship exists"). At bottom, a single transaction involving a substantial quantity of drugs can support a reasonable inference of knowledge of a conspiratorial relationship.

Here, two pounds of methamphetamine readily satisfies the threshold of a "substantial quantity" of drugs from which a jury could find that Seigler understood that the methamphetamine he sold to Cino was for redistribution rather than personal use. Indeed, we have previously held that a jury is justified in inferring a seller-defendant's knowledge that the drugs were "going to be further distributed" when the sale in question involved single-digit ounces, a quantity far lower than the two pounds (32 ounces) of methamphetamine Seigler sold to Cino. *United States v. Yearwood*, 518 F.3d 220, 226 (4th Cir. 2008) (concluding that evidence of a discussion of selling seven ounces and a transaction involving five ounces "far exceeded the amounts involved in a simple buyer-seller transaction, and support[ed] an inference that [the defendant and another individual] were distributing drugs together"); *Allen*, 716 F.3d at 104 (concluding that evidence of 3.5 ounces of crack cocaine—"enough to produce over 1000 crack rocks"—supported

10

knowledge of a distribution conspiracy because, in our view, "[i]t is hard to fathom that one would purchase in short order the equivalent of [that much drugs] for personal use"); *United States v. Lamarr*, 75 F.3d 964, 973 (4th Cir. 1996) (same, for possession of 5.72 ounces of crack).

But the March 9 transaction is not the only record evidence supporting the conclusion that Seigler knowingly entered into the distribution conspiracy. The jury also heard the two recorded conversations between Cino and Seigler, the substance of which further supports the verdict. For instance, the jury heard the informality of initial conversation from which it could infer the existence of an established relationship between Cino and Seigler. There were no introductions to each other or the subject matter of the call. *See Burgos*, 94 F.3d at 869–70 (discussing cases in which "familiarity" between defendant and a conspirator "constitutes further circumstantial evidence" of the defendant's participation in the conspiracy). The jury also heard both men use coded and circumlocutory language from which it could infer—as the Government contended—that Cino was acting as a middleman and had to confirm the quantity a third-party wanted to buy from him before finalizing the purchase from Seigler. And it heard Seigler say he would call another individual to set things up on his end, from which the jury could reasonably infer that each man was part of a vertically oriented distribution chain. *See, e.g.*, *United States v. Caldwell*, 589 F.3d 1323, 1329 (10th Cir. 2009) ("The classic vertical conspiracy involves Supplier A selling contraband to Supplier B, who then sells contraband to Supplier C."); *United States v. Prieskorn*, 658 F.2d 631, 634–35 (8th Cir. 1981) ("The large quantity of cocaine involved here supports an inference . . . that appellant knew that

11

he was a part of a venture which extended beyond his individual participation. . . . By virtue of this quantity the vertical nature of the conspiracy was known to the suppliers and customers." (internal alteration and citation omitted)). All told, the recordings were additional evidence that allowed the jury to infer Seigler's knowledge and participation in the distribution conspiracy.

Although Seigler argues that other, innocent, inferences could also be drawn from the recordings, that determination was for the jury to make, and it rejected his characterizations. *United States v. Murphy*, 35 F.3d 143, 148 (4th Cir. 1994) ("The jury, not the reviewing court, . . . resolves any conflicts in the evidence presented, and if the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe." (internal citations omitted)); *United States v. Aichele*, 941 F.2d 761, 764 (4th Cir. 1991) ("A defendant's knowledge of and participation in a conspiracy may be inferred from circumstantial evidence and from evidence of the defendant's actions. Acts which seem otherwise innocent, when viewed in the context of the surrounding circumstances, may justify an inference of complicity." (internal alteration and quotation marks omitted)).

Lastly, while evidence of Seigler's flight and failure to appear on his initial trial date must be used cautiously, our precedent allows for the jury to consider that conduct and Seigler's guilty plea as evidence of his "consciousness of guilt" to the underlying conspiracy. *See United States v. Ath*, 951 F.3d 179, 187 (4th Cir. 2020) (observing that later evidence of "consciousness of guilt" tends to prove that "the defendant knew he was doing something wrong or illegal, which bears upon the issue of knowledge" to support

12

the participation in an unlawful conspiracy); *see also United States v. Gonzalez*, 834 F.3d 1206, 1217 (11th Cir. 2016) ("[T]he jury also was entitled to consider evidence of [the defendant's] pretrial flight . . . as substantive evidence of her consciousness of guilt of the charged conspiracies."); *United States v. Hernandez-Miranda*, 601 F.2d 1104, 1107 (9th Cir. 1979) ("Flight immediately after the commission of a crime, or immediately prior to trial, both support an inference of consciousness of guilt."). In this case, the jury was free to accept both the uncontested fact that Seigler failed to appear at his first trial date and the officer's testimony that *Seigler* fled when they tried to apprehend him at his residence the next day as evidence of guilt. Even "weak" evidence of guilt that may not be sufficient to convict on its own can nonetheless be evidence that—when coupled with other evidence—supports a sufficiency determination. *See United States v. Foutz*, 540 F.2d 733, 740 (4th Cir. 1976) (acknowledging that "[t]he inference that one who flees from the law is motivated by consciousness of guilt is weak at best" and limiting when related evidence and jury instructions should be given).[8]

In sum, the evidence of Seigler's sale of two pounds of methamphetamine to Cino, the substance of the two recorded conversations between Seigler and Cino, and Seigler's flight and failure to appear at his initial trial date constitutes substantial evidence sufficient for the jury to have found that Seigler and Cino "acted in concert to achieve an illegal goal," i.e., the charged distribution conspiracy. *United States v. Chambers*, 985 F.2d 1263,

---

[8] Seigler does not challenge the admission of evidence or jury instruction relating to his consciousness of guilt.

1270 (4th Cir. 1993) (citation omitted). For this reason, Seigler's challenge to his conviction on this ground fails.

## B. Verdict Form

Next, Seigler challenges the special verdict form by which the jury was asked to make the following determinations—

We, the jury, unanimously find as follows:

Did the government prove beyond a reasonable doubt that the defendant conspired to manufacture, distribute, or possess with intent to distribute controlled substances and/or to use a communication facility in committing or facilitating a controlled substance offense, as charged in the Indictment:



    Not Guilty        Guilty

If you find the defendant guilty, state the purpose or purposes of the conspiracy:

_____ To manufacture, distribute, or possess with intent to distribute controlled substances.

_____ To use a communication facility in committing or facilitating a controlled substance offense.

14

If you find a purpose of the conspiracy was to manufacture, distribute, or possess with intent to distribute controlled substances, state the controlled substance or substances involved:

____✓____ Methamphetamine

_____ Oxycodone

If you find that methamphetamine was involved, what amount of mixture or substance containing methamphetamine is attributable to the defendant?

_____ Less than 50 grams

_____ 50 grams or more, but less than 500 grams

____✓____ 500 grams or more

J.A. 432–33.

Seigler contends that two aspects of the special verdict form require vacating his conviction and entitle him to a new trial. First, he asserts the use of the "and/or" construction in the first question, which was used to link the two possible objects of the conspiracy, render it impossible to conclude that the jury unanimously agreed about the conspiracy's object. Second, he contends the description of the use of a communication facility object incorrectly stated the statutory elements, omitting the word "felony" before "controlled substance offense," meaning that the jury erroneously could have convicted him based on proof of a misdemeanor drug offense.

Because Seigler did not object to either aspect of the verdict form in the district court, we review for plain error. Fed. R. Crim. P. 30(d); Fed. R. Crim. P. 52(b); *see United States v. Olano*, 507 U.S. 725, 732–35 (1993). This means that the Court will not grant relief unless there has been (1) error; (2) that is plain, i.e., "clear" or "obvious"; (3) "[that]

15

affects [the defendant's] substantial rights," meaning that it "must have been prejudicial: It must have affected the outcome of the district court proceedings." *Olano*, 507 U.S. at 732–35. Even when these requirements are met, the Court's authority to recognize plain error is "permissive, not mandatory," and should be employed only to prevent "a miscarriage of justice." *Id.* at 735–36 (citation and internal quotation marks omitted).

Seigler has not demonstrated he is entitled to have his conviction vacated for a new trial because he has not shown error or prejudice. Starting with the verdict form, we discern no obvious problem despite the use of the "and/or" construction. *See Carver v. Martin*, 664 F.2d 932, 935 (4th Cir. 1981) ("A verdict is sufficient if the jury's intention can be ascertained with reasonable certainty from the language used in the verdict." (citation omitted)); *see also Briley v. Bass*, 742 F.2d 155, 166 (4th Cir. 1984) (holding that a verdict form's use of the and/or description of two grounds for aggravating factors was not erroneous where other circumstances surrounding the verdict showed that the jury's decision as to the two grounds was unanimously made). The form begins by instructing the jury to "unanimously find" everything that follows, as demonstrated by the indented paragraphs for each separate determination that followed. J.A. 432. Structurally and visually, this umbrella paragraph applies to each of the jury's responses.

Turning to the plain statement of the finding of guilt, it indicates that the jury found "beyond a reasonable doubt that [Seigler] conspired to manufacture, distribute, or possess with intent to distribute controlled substances and/or to use a communication facility in committing or facilitating a controlled substance offense." J.A. 432. There's no discernible legal error arising from this construction. To convict, the jury was not required to find both

16

objects of the conspiracy, as reading the sentence with the word "and" would require. A construction that could require the Government to prove *more* than it was required would only inure to Seigler's favor, not his disadvantage. Reading the completed verdict form as a whole, along with the instructions, shows that the jury did so find, as discussed below. Moreover, the other reading of this sentence—using the word "or"—would accurately state the Government's burden to prove the existence of one object *or* the other object. *United States v. Bolden*, 325 F.3d 471, 492 (4th Cir. 2003) ("Courts have uniformly upheld multiple-object conspiracies, and they have consistently concluded that a guilty verdict must be sustained if the evidence shows that the conspiracy furthered *any one of the objects* alleged." (emphasis added)). The "or" construction does not prejudice Seigler in any way either as that reading would require the jury to unanimously find one or the other objective, which it clearly did.

The verdict form shows that the jury made additional findings related to "the purpose or purposes of the conspiracy" that confirm the jury's unanimity as to the conspiracy's purposes. J.A. 432. The jury placed checks besides both objects, indicating that the jury had unanimously found the Government proved both purposes beyond a reasonable doubt. Again, the Government was not required to prove both objectives to obtain a conviction, but these additional check marks bolster the conclusion that the jury unanimously found both purposes as opposed to one or the other. Further, under the umbrella instruction of being unanimous, the jury was instructed that if it found the distribution objective, it should also identify which of two controlled substances (methamphetamine and oxycodone, or both) it found Seigler had participated in

17

distributing. The jury specifically found, again under the instruction that it must be unanimous, that the conspiracy involved methamphetamine alone and that Seigler was responsible for the distribution of 500 grams or more of it. The totality of the verdict form makes clear both that the jury unanimously found Seigler guilty of participating in a conspiracy involving both objects and that it also unanimously found additional facts regarding the nature of the drug distribution. *See, e.g.*, *United States v. Stegmeier*, 701 F.3d 574, 580–81 (8th Cir. 2012) (discussing the role of the special verdict form in "ensuring that the jury reached specific unanimity and clarifying its findings for appeal").

Even if the verdict form caused some slight confusion as to what the jury must find, the jury instructions accurately clarified what the jury was directed to find in order to convict Seigler. The Supreme Court has recognized that even when a "verdict form[] standing alone could have persuaded a jury to conclude that unanimity was not required . . . , any confusion by the verdict form[] [can be] clarified when considered in light of the entire jury instruction." *Jones v. United States*, 527 U.S. 373, 393 (1999) (citation omitted). That clarification exists here because the district court clearly articulated the unanimity requirement when it described each of the charged objects of the conspiracy and then stated, first, "Although you must unanimously agree that the conspiracy had at least one of these alleged objects, you must unanimously agree as to which object the government has proved beyond a reasonable doubt," and, second, "The government is not required to prove more than one of the objects charged." J.A. 405–06. These instructions plainly and accurately recited what the jury had to unanimously find to convict and aided the jury in

18

understanding the verdict form. What's more, the jury had a copy of these instructions along with the verdict form during their deliberations.

Based on the foregoing, we conclude that Seigler has not demonstrated that using the and/or construction was error, much less that it satisfied the plain error standard. *See, e.g.*, *United States v. Bryan*, 868 F.2d 1032, 1038 (9th Cir. 1989) (rejecting defendant's argument on plain error review that an and/or construction verdict form coupled with failure to instruct the jury that it must be unanimous as to the elements constituted reversible error because the indictment, instructions, and verdict form were in alignment such that there was no genuine possibility of jury confusion). Further, because the conspiracy conviction can stand based on the first object of the conspiracy (drug distribution), we need not consider Seigler's challenge to the verdict form's wording of the second object of the conspiracy (use of a communication facility). *See United States v. Lawson*, 677 F.3d 629, 655 (4th Cir. 2012) (affirming a conspiracy conviction for a multi-object conspiracy in which the special verdict form indicated the jury found both objects of the single count to be present and the Court's review supported that finding as to one of the objects).

## C. *Franks* Hearing

Seigler next asserts that before trial began, the district court should have ordered a *Franks*[9] hearing because he had made a prima facie showing that the Nevada wiretap warrant application for Cino's cell phone relied on statements the affiant knew and

---

[9] *Franks v. Delaware*, 438 U.S. 154 (1978).

19

intended to be false or made with reckless disregard for their truth or falsity. He argues that this showing entitled him to a hearing to inquire further into whether there was a factual basis for suppressing all evidence obtained as a result of the warrant. Seigler's contention that the application contained false and misleading statements is limited to its assertions in support of permitting the request for electronic surveillance: that physical surveillance was "foreclosed" due to the nature of established "Hispanic" communities, where "the presence of new vehicles is easily detected." J.A. 97–98. In Seigler's view, the application falsely referred to Hispanic communities given that none of the individuals identified in the conspiracy were Hispanic. Further, he claims it was untrue that physical surveillance was "foreclosed," because the March 9 surveillance demonstrated that law enforcement was able to continue conducting physical surveillance undetected and successfully. We find no reversible error here.

To demonstrate that a *Franks* hearing is warranted, "the accused must make a substantial preliminary showing that false statements were either knowingly or recklessly included in an affidavit supporting a search warrant *and* that, without those false statements, the affidavit cannot support a probable cause finding." *United States v. Allen*, 631 F.3d 164, 171 (4th Cir. 2011) (emphasis in original). In considering whether the district court should have ordered a *Franks* hearing, we review legal determinations *de novo* and any factual findings for clear error. *Id.*

The probable-cause affidavit supporting the Nevada court's wiretap warrant was forty-six pages long and contained 101 paragraphs. Of those, Seigler challenges part of one paragraph. He offers no proof that the passing reference to "Hispanic communities" was

20

misleading, but instead offers a conclusory assertion that none of the indicted individuals in this multi-state conspiracy was Hispanic. Nor is it self-evident that the substantive component of the paragraph—that it's harder to conduct physical surveillance in established communities where unfamiliar vehicles would attract attention—would not be true regardless of the neighborhood's demographic. In short, there's no indication that this representation actually was false or misleading, that it was knowingly or recklessly so, or that it was the basis of the court's probable cause finding.

We reach the same conclusion as to the application's statements about physical surveillance. Just prior to the paragraph Seigler challenges, in a section labeled "physical surveillance," the affidavit states that "[p]hysical surveillance has been attempted in this investigation *and will continue to be utilized*," but would be "of limited value" "if not used in conjunction with other techniques, including electronic surveillance." J.A. 97 (emphasis added). Read in tandem, these statements represent that a wiretap would assist ongoing physical surveillance and elaborate on why physical surveillance alone would be inadequate. In short, there's no contradiction between the application and subsequent events, nothing suggesting knowingly misleading statements or ones made with reckless disregard for their truth or falsity, and no indication that this representation was particularly relevant to the probable cause determination.

Based on the foregoing, Seigler has not met his initial burden of showing that he was entitled to a *Franks* hearing.[10]

## D. Sentencing Issues

Lastly, Seigler raises two issues related to calculating his advisory Guidelines range that he argues entitle him to resentencing. First, Seigler contends the district court clearly erred in holding him responsible for between four and eight pounds of methamphetamine in determining his base offense level. Second, he asserts the district court should not have imposed U.S.S.G. § 3C1.1's two-level enhancement for obstruction of justice. We disagree with Seigler on both issues and therefore affirm his sentence.

### 1. Drug Weight Testimony

The PSR held Seigler responsible for between four and eight pounds of methamphetamine, which set his Guidelines base offense level at 36. Of that, two pounds were based on the March 9 sale to Cino, an amount Seigler does not dispute. Rather, he argues the district court should not have held him responsible for any amount beyond that initial two pounds because the factual basis for doing so was inadequate. The drug weight calculation matters because if it had been based solely on the March 9 sale, Seigler's base offense level would have been two levels lower, resulting in a lower advisory Guidelines range.

---

[10] Seigler also challenges the standard we apply to determine whether a *Franks* hearing should be held. As discussed earlier, we are not at liberty to alter the principles set out in prior decisions of this Court. *Taylor*, 930 F.3d at 619.

At the sentencing hearing the Government elicited testimony from a U.S. Drug Enforcement Administration agent involved in the investigation. He testified that he participated in a May 5, 2016, interview in which Cino made a proffer concerning the conspiracy. At that time, relevant to Seigler, Cino told the DEA agent that he had begun purchasing methamphetamine from Seigler in early 2016 and that before the March 9 transaction, "he had previously obtained a half pound to one pound of methamphetamine from Mr. Seigler on four to six other occasions." J.A. 452; *see also* J.A. 456 ("Half pound to a pound. He wasn't sure if it was a pound or a half pound."). Crediting this statement would result in Seigler being held responsible for an offense involving two to six pounds more of methamphetamine than was involved in just the March 9 transaction.

The district court overruled Seigler's objection that this testimony was not sufficient to support a total drug weight of four to eight pounds of methamphetamine. After reciting the relevant standards, the district court credited the testimony of the DEA agent, "who received that information from Mr. Cino. . . . He had the opportunity to question Mr. Cino and receive from Mr. Cino the stated information. And I find that the information presented by Mr. Cino is reliable and can be considered, even though it is hearsay testimony." J.A. 463. The court further noted that the testimony was "corroborated by all of the evidence in the case," J.A. 463, and was "not extreme. In other words, he did not indicate either a length of time of purchasing methamphetamine from Mr. Seigler or excessive amounts," and this evidence was "reliable," J.A. 464. As such, it adopted the drug weight set out in the PSR and set the base offense level at 36.

On appeal, Seigler argues the district court clearly erred in holding him responsible for more than the two pounds of methamphetamine from the March 9 transaction because the district court mistakenly referred to Cino's "testimony" when Cino never testified and the DEA agent's testimony about Cino's proffer was insufficient to support the finding. He contends that, consequently, no credible, reliable evidence supports the district court's drug weight finding. We disagree.

The Guidelines permit district courts to "consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a). The district court's explanation cites specific reasons for finding the DEA agent's testimony reliable and accurate, and Seigler offers no specific basis for questioning it other than that it was hearsay. But "uncorroborated hearsay" can be the basis for determining drug weight so long as it satisfies the above standards of reliability. *United States v. Crawford*, 734 F.3d 339, 342 (4th Cir. 2013) (citation omitted); *see also United States v. Uwaeme*, 975 F.2d 1016, 1019 (4th Cir. 1992) ("For sentencing purposes, hearsay alone can provide sufficiently reliable evidence of quantity."). The totality of the district court's statements regarding the drug weight finding show that it did not mistakenly believe Cino testified, but was simply crediting Cino's statements to the DEA agent. Having reviewed the record, we conclude the district court did not commit reversible error in attributing four to eight pounds of methamphetamine to Seigler.

## 2. Guidelines Obstruction of Justice Enhancement

Seigler next contends the district court should not have imposed a two-level enhancement to his base offense level based on obstruction of justice under U.S.S.G. § 3C1.1. That Guideline provides for a two-level increase to the offense level if

> (1) the defendant willfully obstructed or impeded . . . the administration of justice with respect to the . . . prosecution . . . of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense.

U.S.S.G. § 3C1.1. Because Seigler did not challenge the enhancement in the district court, we review for plain error. *See Olano*, 507 U.S. at 732–35.

During sentencing, the district court *sua sponte* raised a concern about the interaction between the sentence for the failure to appear conviction, which by statute had to run consecutively to any sentence imposed for the underlying offense, and the imposition of § 3C1.1's two-level enhancement. In its view, this resulted in a "problem of, in essence, sort of double counting." J.A. 447. The court later expressly indicated that this concern was one reason it decided to impose a downward-variant sentence as to Seigler. *See* J.A. 503 (stating "it would be excessive to impose a sentence within the guideline range that, in effect, punishes the defendant both for his conviction of failure to appear and also the higher guideline level by virtue of adding two offense levels to the calculation of his advisory guidelines").

Despite the district court's attention to this concern, Seigler argues on appeal that his offense level should not have been enhanced under § 3C1.1 because he had been separately convicted of a criminal offense for the same act of obstruction of justice. As

25

support for this proposition, Seigler points to § 3C1.1's application notes, which state that the enhancement should not apply to the offense level for a conviction for an offense "covered by . . . § 2J1.6 (Failure to Appear by Defendant)." U.S.S.G. § 3C1.1 cmt. n.7. His argument, however, rests on a misunderstanding of how his advisory Guidelines range was calculated and what § 3C1.1's application notes provide.

Seigler was sentenced at the same time for both his failure to appear and conspiracy convictions. Under U.S.S.G. § 3D1.2(d), the offenses were grouped for purposes of calculating his Guidelines range, with the range being based on the conviction resulting in the higher offense level. Here, that meant that Seigler's conspiracy conviction—not the failure to appear conviction—was used to calculate his offense level.

Both the text of § 3C1.1 and its application notes support imposition of the two-level enhancement to the calculation of Seigler's offense level for the conspiracy conviction. First, he plainly "obstructed or impeded" his conspiracy conviction by failing to appear for his initial trial date. Seigler does not contest that this criterion is satisfied. Nor could he, as application note 4(E) specifically lists willfully failing to appear for a judicial proceeding as conduct covered by this Guidelines provision. Second, the exception Seigler relies on does not apply to calculate the Guidelines for his conspiracy conviction because it states that "[i]f the defendant is convicted for an offense covered by . . . § 2J1.6 (Failure to Appear by Defendant) . . . , this adjustment is not to be applied to the offense level *for that offense*" except in certain circumstances that do not apply here. *Id.* (emphasis added). By its plain terms, the exception is limited to calculating the Guidelines range for only the failure to appear conviction. But, as noted, Seigler's Guidelines range was calculated based

26

on Seigler's conspiracy conviction. The district court thus did not err in calculating Seigler's Guidelines range to include § 3C1.1's two-level offense enhancement, which set his adjusted total offense level at 38.

III.

For the reasons discussed above, the judgment of the district court is

*AFFIRMED*.

GREGORY, Chief Judge, concurring in the judgment:

I concur in the judgment to affirm Seigler's conviction and sentence. The majority correctly holds that the Government presented sufficient evidence at trial to convict Seigler of the conspiracy offense, but, in my view, it extends further than necessary to reach that conclusion. Namely, I disagree that under these facts our precedent establishes that evidence of a single, large-quantity buy-sell transaction may always stand as evidence of a conspiracy. Further, I find the Government's evidence of flight is insufficient to support the jury's verdict.

The majority identifies three pieces of evidence that, collectively, substantiate the jury's verdict here: (1) Seigler's sale of two pounds of methamphetamine to Cino, (2) the content of Seigler's recorded telephone conversations with Cino, and (3) Seigler's flight and failure to appear for trial. I diverge from the majority in how it considered this evidence.

First, I do not agree with the majority's finding that Seigler's failure to appear for trial in Virginia and subsequent flight from law enforcement is evidence that he knew of and knowingly participated in a conspiracy. Admittedly, other circuits have recognized that evidence of flight may be considered evidence of "consciousness of guilt." *See United States v. Gonzalez*, 834 F.3d 1206, 1217 (11th Cir. 2016) (jury entitled to consider evidence of defendant's pretrial flight as evidence of consciousness of guilt); *United States v. Hernandez-Miranda*, 601 F.2d 1104, 1007 (9th Cir. 1979) (flight immediately after commission of a crime or immediately prior to trial supports an inference of consciousness

28

of guilt). But the majority fails to cite to any Fourth Circuit case that reaches the same conclusion.

Rather, the majority relies upon this Court's opinion in *United States v. Ath*, 951 F.3d 179 (4th Cir.), *cert. denied*, 140 S. Ct. 2790 (2020), as support for its conclusion. *Id.* at 187. This reliance is misplaced. *Ath* does not address the question of whether *flight* is evidence of consciousness of guilt. There, the court examined the defendant's false exculpatory statements—not failure to appear or flight from law enforcement—as evidence of consciousness of guilt. *See id.* Evidence of flight meaningfully differs from other types of misconduct that could demonstrate that a defendant knew he was guilty of the offense charged. Accordingly, we must proceed cautiously when considering such evidence.

There is an "inherent weakness" in flight evidence—it may not reflect a defendant's consciousness of guilt for the crime charged. *See United States v. Henley*, 811 F. App'x 159, 165 (4th Cir. 2020); *see also United States v. Foutz*, 540 F.2d 733, 739–40 (4th Cir. 1976) (references to and evidence of flight excluded where no showing that defendant, who faced arrest for both a bank robbery charge and an unrelated parole violation, left the city where he normally resided). "[E]vidence regarding a criminal suspect's flight is inherently weak because one who flees to evade capture by the police does not necessarily do so based on his consciousness of guilt for committing a certain crime." *Henley*, 811 F. App'x at 164 (citing *Foutz*, 540 F.2d at 739–40).

> The inference that one who flees from the law is motivated by consciousness of guilt is weak at best, and . . . the strength of the inference is further attenuated when the defendant has not actively sought to avoid capture. The danger of permitting the inference is further compounded in a case such as this one where the defendant is wanted for another infraction. In many

29

situations, the inference of consciousness of guilt of the particular crime (based upon flight) is so uncertain and ambiguous and the evidence so prejudicial that one is forced to wonder whether the evidence is not directed to punishing the "wicked" generally rather than resolving the issue of guilt of the offense charged.

*Foutz*, 540 F.2d at 740 (internal citation omitted).

The attenuation concern raised in *Foutz* is present here. Seigler did not flee immediately after being caught committing an act in furtherance of the conspiracy. Initially, he simply failed to appear for trial. Nor was he "on the run" after failing to appear; he remained in the Las Vegas area where he was ultimately apprehended. And when he was arrested, he surrendered without incident. J.A. 492. Moreover, the Government did not establish beyond a reasonable doubt at trial that it was in fact Seigler and not his brother who fled from the Marshals on an earlier occasion at Seigler's home. The deputy marshal who apprehended Seigler testified that he knew Seigler had a brother who was similar in appearance and acknowledged that it was possible that it was his brother who fled from them. J.A. 345–46.

But even assuming that it was Seigler who fled from the Marshals, this evidence does not necessarily lead to the conclusion that he was guilty of the underlying offense of conspiracy. It is quite plausible that he fled not because he was part of a drug conspiracy, but because he had participated in a drug transaction with Cino and had subsequently failed to appear for trial. Or perhaps he did not want to go to trial for fear of being convicted of a crime he believed he did not commit. As the trial judge instructed the jury in this case, failure to appear for trial or fleeing from law enforcement may indicate knowledge of guilt; "[o]n the other hand, an innocent person may fail to appear for trial or flee from law

30

enforcement for some other reason." J.A. 400–01.  This tenuous and speculative evidence of Seigler's "flight" from law enforcement is simply too thin to support a finding beyond a reasonable doubt that Seigler is guilty of the distribution conspiracy offense.

Second, with regard to the evidence of the drug transaction, the majority notes that our Circuit "has recognized that evidence of a buy-sell transaction involving a 'substantial quantity of drugs' can support a 'reasonable inference' of knowing participation in a distribution conspiracy."  Maj. Op. at 9 (quoting *United States v. Mills*, 995 F.2d 480, 485 n.1 (4th Cir. 1993) ("[E]vidence of a buy-sell transaction, when coupled with a substantial quantity of drugs, would support a reasonable inference that the parties were coconspirators.").  But Seigler urges us to consider the Seventh Circuit's opinion in *United States v. Townsend*, 924 F.2d 1385 (7th Cir.1991), where the court held that "evidence of a buyer-seller relationship, *standing alone*, is insufficient to support a conspiracy conviction," and "[t]he mere purchase or sale of drugs (even in large quantities) does not demonstrate an agreement to join a drug distribution conspiracy . . . ."  *Id.* at 1394 (emphasis added).  By itself, a "buy-sell transaction is simply not probative of an agreement to join together to accomplish a criminal objective beyond that already being accomplished by the transaction."  *Id.*  A conspiracy conviction, *Townsend* explains, "requires something more than the simple exchange of drugs for money, such as *obtaining* drugs for distribution . . . ."  *Id.* (emphasis in original).

Although this Court is constrained by its precedent in *Mills*, this case is distinguishable on its facts.  Unlike the defendants in *Mills*, no co-conspirator testified at Seigler's trial regarding either the drug transaction or Seigler's purported knowledge of or

31

participation in a drug conspiracy. In fact, Seigler was unknown to law enforcement prior to his recorded conversations with Cino. Therefore, the court's reasoning in *Townsend* is instructive in assessing the adequacy of the evidence here. Absent any direct testimony establishing a "buyer-seller relationship" between Seigler and the other alleged conspirators, "something more than the simple exchange of drugs for money" should constitute the "substantial evidence" necessary to support a jury's verdict that Seigler is guilty of conspiracy. *See Townsend*, 924 F.2d at 1394.

Nevertheless, I concur in the judgment because even when given its proper treatment, the record evidence supports Seigler's conviction. The recorded conversations between Seigler and Cino were pivotal to the Government's case. This was particularly true given that Cino did not testify at trial. This evidence, together with the evidence of a large-quantity drug sale, constitutes "substantial evidence" to support the jury's verdict that Seigler knew of and knowingly participated in a conspiracy to distribute methamphetamine.

As the majority notes, the recorded conversations demonstrate that Seigler and Cino spoke using a vague, coded language that allowed them to communicate the information necessary to conduct their drug transaction. Cino told Seigler he needed to confer with someone else to confirm the quantity of drugs he wished to purchase. After speaking with Callihan in Virginia, Cino informed Seigler that "from *what I understand*, it looks like it's gonna be a 'deuce,'" a word understood by law enforcement, based on training and experience, to mean "two." Seigler in response told Cino that he would make a call to an unnamed third person "right now" and set up the transaction. The content of their phone

32

calls, which also included discussion of the purchase price, was consistent with Seigler selling, and Cino purchasing, the two pounds of methamphetamine ultimately recovered from Cino's car. Moreover, the phone calls provided evidence that both Seigler and Cino were connected to other individuals involved in the supply and distribution chain of the subject drugs. These conversations provide the "something more" beyond a single, large-quantity drug transaction that was sufficient for a jury to find beyond a reasonable doubt that Seigler knew of the drug conspiracy and knowingly participated in it when he received the methamphetamine he sold to Cino.