**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 23-4048**

_____

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

BRAYAN ALEXANDER CONTRERAS-AVALOS,

Defendant – Appellant.

_____

**No. 23-4133**

_____

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

LUIS ARNOLDO FLORES-REYES,

Defendant – Appellant.

_____

**No. 23-4158**

_____

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

JAIRO ARNALDO JACOME, a/k/a Abuelo,

        Defendant – Appellant.

_____

Appeals from the United States District Court for the District of Maryland, at Greenbelt. Paula Xinis, District Judge.   (8:17-cr-00382-PX-15;  8:17-cr-00382-PX-12;  8:17-cr-000382-PX-1)

_____

Argued:  March 19, 2025                          Decided:  June 3, 2025

_____

Before WILKINSON, NIEMEYER, and WYNN, Circuit Judges.

_____

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Niemeyer and Judge Wynn joined.

_____

**ARGUED:** Emily Deck Harrill, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Columbia, South Carolina; Peter Linn Goldman, SABOURA, GOLDMAN & COLOMBO, PC, Alexandria, Virginia, for Appellants.  Ethan A. Sachs, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Alfred Guillaume III, LAW OFFICES OF ALFRED GUILLAUME III, Greenbelt, Maryland, for Appellant Luis A. Flores-Reyes.  Edmund Gregorie Monroe Neyle, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Florence, South Carolina, for Appellant Jairo A. Jacome.  Nicole M. Argentieri, Principal Deputy Assistant Attorney General, Lisa H. Miller, Deputy Assistant Attorney General, Appellate Section, Criminal Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Erek L. Barron, United States Attorney, Baltimore, Maryland, Timothy F. Hagan, Assistant United States Attorney, Christopher M. Sarma, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee.

WILKINSON, Circuit Judge:

After a series of violent killings, Brayan Alexander Contreras-Avalos, Jairo Arnaldo Jacome, and Luis Arnoldo Flores-Reyes were charged with various crimes relating to their involvement in the transnational gang MS-13. At the close of a two-week trial, the jury returned a guilty verdict on all counts. The district court denied appellants' motions for acquittal or a new trial and sentenced each to life in prison. On appeal, Jacome and Flores-Reyes argue that two misstatements in the court's oral jury instructions, which were corrected in the written instructions, now require the reversal of their convictions for murder in aid of racketeering. All three appellants also challenge the sufficiency of the evidence against them. For the following reasons, we affirm the judgment.

I.

A.

Appellants were convicted in a jury trial, so we recount the evidence in the light most favorable to the government. *United States v. Huskey*, 90 F.4th 651, 660 (4th Cir. 2024). Viewed from any angle, the facts here are striking in their cruelty.

Contreras-Avalos, Jacome, and Flores-Reyes were members of La Mara Salvatrucha, commonly known as MS-13. Headquartered in El Salvador, MS-13 is a violent street gang active throughout the United States and Central America. Its members regularly engage in "homicides, robberies, extortions, prostitution, human smuggling, narcotics trafficking, firearms trafficking," and other crimes. J.A. 812. There is no question that MS-13's mission is one of brutality: the gang's primary motto is "kill, rape, control." J.A. 849, 1056.

3

MS-13 members are organized vertically by rank and horizontally by territory. At the top of the hierarchy is the leadership in El Salvador, which administers subdivisions of the gang called programs. Programs are further divided into local cliques. Within a clique, prospective and lower-ranking members are expected to carry out increasingly heinous criminal acts to move up the ranks. To become a "homeboy," a full-fledged member of the gang, individuals are typically expected to commit at least one homicide. J.A. 826. Each clique is led by a "first word" who has the final say within the clique and is responsible for communicating with higher leadership. J.A. 826–28.

This case involves two cliques operating in Maryland, the Sailors and the Langley Park Locos Salvatrucha ("LPS"). Flores-Reyes and Contreras-Avalos were Sailors homeboys. In 2015, Flores-Reyes became the clique's first word. Jacome was a longtime LPS homeboy who acted as "boss" of LPS. J.A. 2382. Between 2015 and 2018, members and associates of both cliques extorted money from businesses, sold illegal drugs, and committed horrific acts of violence.

Among the violent acts committed by the Sailors and LPS during this period were at least six gruesome killings, two of which are directly relevant to appellants and their claims on appeal. In December 2016, fourteen-year-old Anner Duarte-Lopez was murdered near Germantown, Maryland. The middle-school student was a prospective recruit who collected "rents," or extortion payments, for Jacome. J.A. 2370–71. He was beaten and stabbed to death for allegedly talking to the police. In March 2017, seventeen-year-old Raymond Wood was murdered near Bedford, Virginia. The teenager was killed because

4

MS-13 members believed him to be a member of a rival gang. Like Duarte-Lopez, Wood was beaten and stabbed to death.

B.

In July 2021, a grand jury returned a final superseding indictment charging Contreras-Avalos, Jacome, Flores-Reyes, and two co-defendants with ten counts. The following counts are relevant to this appeal. Count 1 charged all three appellants with racketeering conspiracy in violation of 18 U.S.C. § 1962(d). Count 5 charged Jacome with committing and aiding and abetting a violent crime in aid of racketeering ("VICAR"), namely murder, in violation of 18 U.S.C. § 1959(a)(1) and § 2, based on the December 2016 killing of Duarte-Lopez. Count 7 likewise charged Flores-Reyes with committing and aiding and abetting VICAR murder in violation of 18 U.S.C. § 1959(a)(1) and § 2, based on the March 2017 killing of Wood. Count 8 charged Contreras-Avalos and Flores-Reyes with conspiracy to distribute and possess with intent to distribute controlled substances in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count 10 charged Jacome and Flores-Reyes with conspiracy to interfere with interstate commerce by extortion in violation of 18 U.S.C. § 1951(a). J.A. 606–44.

Appellants were tried jointly before a jury. The jury found the defendants guilty on all counts. Defendants moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29 and for a new trial under Rule 33. The district court denied these motions. J.A. 2512–13, 2544, 2816–21, 3097–106, 3131–32, 3216–17, 3281–82.

Appellants were then sentenced by the district court. Contreras-Avalos was sentenced to life in prison on Count 1 and to 60 months concurrently on Count 8. Jacome

was sentenced to concurrent terms of life in prison on Counts 1 and 5, and 57 months on Count 10. Flores-Reyes received concurrent terms of life in prison on Counts 1 and 7, 60 months on Count 8, and 78 months on Count 10. J.A. 3183, 3308, 3314.

The defendants now appeal. Jacome and Flores-Reyes argue that the district judge made two errors in her oral instructions to the jury which require us to vacate their convictions under Counts 5 and 7. All three appellants further contend that there was insufficient evidence to support some of their convictions.

## II.

We begin with the jury instructions. The Fifth Amendment provides that "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. amend. V. "It is therefore 'the exclusive province of the grand jury to alter or broaden the charges set out in an indictment.'" *United States v. Banks*, 29 F.4th 168, 173–74 (4th Cir. 2022) (quoting *United States v. Moore*, 810 F.3d 932, 936 (4th Cir. 2016)). A constructive amendment in violation of the Fifth Amendment occurs if a "defendant is actually convicted of a crime other than that charged in the indictment." *Id.* at 174; *see also Moore*, 810 F.3d at 936. Thus, if a conviction results after the district judge in her instructions to the jury "broadens the bases of conviction beyond those charged in the indictment, a constructive amendment—sometimes referred to as a fatal variance—occurs." *Banks*, 29 F.4th at 174 (quoting *United States v. Randall*, 171 F.3d 195, 203 (4th Cir. 1999)).

Jacome and Flores-Reyes argue that a fatal variance occurred here. They point to two erroneous references to "conspiracy" that the district judge made in her oral

6

instructions to the jury on Counts 5 and 7, which alleged substantive crimes, not conspiracy crimes. Although the judge corrected the written instructions to remove those references to conspiracy before they went to the jury, appellants contend that the two oral misstatements impermissibly broadened the bases of conviction to include conspiracy and therefore gave rise to a fatal variance. We first recite the relevant facts and then turn to the legal standard. We conclude that appellants' argument fails on plain error review, and we affirm their convictions.

## A.

Counts 5 and 7 of the indictment charged Jacome and Flores-Reyes with committing and aiding and abetting the murders of Duarte-Lopez and Wood in violation of 18 U.S.C. § 1959(a)(1) and § 2. In Counts 4 and 6, the government separately charged appellants with *conspiring* to commit the same murders in violation of § 1959(a)(5), but it moved to dismiss those counts at the beginning of the trial.

After all of the evidence was presented at trial, the judge turned to the jury instructions. She informed the jury that she would give them oral instructions the following day and that "each [juror would] have a copy of the instructions" during their deliberations as well. J.A. 2543. The judge then dismissed the jurors and gave counsel two hours to review the judge's latest changes to the proposed jury instructions before the charge conference that afternoon. J.A. 2543–45. At that conference, the judge and the parties scrutinized the proposed instructions for over an hour. J.A. 2545–87.

7

The following day, the judge provided the parties with "a printed copy of the most recent version of the jury instructions." J.A. 2592. She asked defense counsel and the government whether "there [were] any issues with the instructions." J.A. 2593. All parties responded no. *Id.*

The judge then called the jurors into the courtroom and began to read those jury instructions. There were 70 instructions and she estimated that it would take "about two and a half hours" to read them. J.A. 2593–94. The jurors did not yet have a written copy of the instructions but were again told, "you will each have your own copy of the instructions back in the jury deliberation room." *Id.* "So don't feel like you need to take notes," the judge added. J.A. 2594. "You absolutely can, but one way we learn is to listen, and so you're more than welcome to just lay back and listen, and then you'll have these to read back in the jury room." *Id.*

After some preliminary instructions, the judge read an overview of the charges. She correctly labeled Counts 1, 8, and 10 as "conspiracy" charges and correctly stated that Counts 5 and 7 charged "murder in aid of racketeering," with no mention of conspiracy. J.A. 2623.

Turning to Count 5, the judge instructed that Jacome was charged with "murder in aid of racketeering." J.A. 2666. Specifically, the government alleged that "for the purpose of gaining entrance to and maintaining an increasing position in MS-13," Jacome "did murder Anner" in violation of 18 U.S.C. § 1959(a)(1). *Id.* The judge proceeded to correctly recite the five elements of the offense:

8

First, that on or about the date charged in Count Five, an enterprise affecting interstate commerce or foreign commerce, namely MS-13, existed.

Second, the enterprise was engaged in racketeering activity.

Third, that the defendant had or was seeking a position in the enterprise.

Four, that the defendant committed or aided and abetted the alleged murder.

And five, that the defendant's general purpose in committing or aiding and abetting the murder was to gain entrance to or maintain or increase position in the enterprise.

J.A. 2667. The judge then read several paragraphs of details regarding each of the five elements. J.A. 2667–71.

The two erroneous references to "conspiracy" that appellants contest were in these more detailed instructions. First, when describing the second element of Count 5, the judge mistakenly referred to the statutory provision as "the *conspiracy to commit* murder in aid of racketeering statute." J.A. 2669 (emphasis added). Second, when instructing the jury on the fifth element, the judge stated that "the government must prove beyond a reasonable doubt that the defendant's general purpose in *conspiring to commit* the charged murder was to maintain or increase position in or to gain entrance to the enterprise." J.A. 2670 (emphasis added). As to the fourth element, which defines the required actus reus, the court once again correctly stated that the government must prove "that the defendant committed or aided and abetted the murder." *Id.*

The judge also gave instructions on Count 7. She noted that Flores-Reyes was charged "with murder in aid of racketeering." J.A. 2671. Specifically, the government alleged that Flores-Reyes "did murder Raymond Wood." J.A. 2672. The judge then

9

correctly recited the same five elements of 18 U.S.C. § 1959(a)(1). For the details of each element, she referred back to the instructions just given for Count 5. J.A. 2672–73.

After reading the instructions, the court dismissed the jury and discussed the instructions with the parties. The judge said she caught a few minor "errors" as she was reading. J.A. 2679; *see e.g.*, J.A. 2680 (catching "a strange space with a comma" and a duplicative "that"). Although she thought that "nothing was so substantive that there was going to be a need to reinstruct on anything," the judge asked the parties to "weigh in." J.A. 2678–79. She did not herself catch the two erroneous references to "conspiracy."

Defense counsel alerted the court to one of the misstatements. He directed the court to the erroneous reference to "conspiring" in the fifth element of Count 5.  Defense counsel stated, "I'm sorry I didn't catch that when it came out last night, but as we were reading it, it's just going to be confusing as it is. I think you can just substitute aiding and abetting for conspiracy." J.A. 2682. The government agreed, and the court updated the instructions to remove this reference to conspiracy. J.A. 2683.

The government then brought everyone's attention to the second misstatement, which mislabeled the statutory provision in the instruction for the second element. J.A. 2683. The court readily agreed to amend the instruction to read "the murder in aid of racketing statute" instead of the "the conspiracy to commit murder in aid of racketeering statute." *Id.*

The court stated that it would make both of those changes to the written instructions before they were printed for the jury but did not suggest reinstructing the jury orally. J.A. 2683–84. Neither party requested that the court reinstruct the jury orally. After a short

10

recess, the parties proceeded to make their closing arguments to the jury. J.A. 2684–797. The parties' closing arguments consistently described Counts 5 and 7 as substantive murder charges, with no references to conspiracy when it came to those charges. *E.g.*, J.A. 2687, 2696–97, 2701, 2737, 2758, 2793, 2796. Jurors then deliberated with the correct written instructions in hand.

### B.

Appellants now argue that those two references to "conspiracy" in the oral jury instructions, although corrected in the written instructions, created a fatal variance in violation of the Fifth Amendment. Their argument is as follows: As laid out in the indictment, Counts 5 and 7 required the government to prove that the defendants committed or aided and abetted VICAR murder in violation of 18 U.S.C. § 1959(a)(1), which carries a maximum penalty of life imprisonment. By contrast, *conspiracy* to commit VICAR murder is prohibited by a different provision, § 1959(a)(5)—which carries a maximum penalty of only 10 years imprisonment—and was not charged in Counts 5 and 7. Appellants contend that the two references to "conspiracy" in the oral jury instructions for Counts 5 and 7 were so confusing and misleading that they impermissibly broadened the basis of conviction to include *conspiracy* to commit murder. Because those misstatements were corrected only in the written instructions and the judge did not orally reinstruct the jury, appellants conclude that a fatal variance occurred between the jury instructions and the indictment.

11

1.

We begin with the standard of review. Appellants did not object to the two "conspiracy" references when they reviewed the printed instructions before the jury charge nor while the instructions were being read aloud. They pointed out one of the misstatements—the government raised the other—only in the post-charge debrief. Importantly, they did not object to, and in fact readily went along with, the district court's proposal to amend the written instructions without reinstructing the jury orally. Now appellants claim that this failure to correct the misstatements orally created a fatal variance. We review unpreserved claims like this for plain error. *See Banks*, 29 F.4th at 178 (holding that "in the Fourth Circuit, alleged constructive amendments not objected to below are subject to plain error review").

To demonstrate plain error, appellants must satisfy "three threshold requirements." *Greer v. United States*, 593 U.S. 503, 507 (2021). They "must establish that: (1) an error occurred; (2) the error was plain; and (3) the error affected [their] substantial rights." *Banks*, 29 F.4th at 174. An error affects substantial rights if the defendant "shows that the error was prejudicial," meaning there is "a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *United States v. Olano*, 507 U.S. 725, 734 (1993); *Greer*, 593 U.S. at 504 (quoting *Rosales-Mireles v. United States*, 585 U.S. 129, 134–35 (2018)). If those three requirements are met, "we will only exercise our discretion to correct the error if it satisfies a fourth prong, that it 'seriously affects the fairness, integrity or public reputation of judicial proceedings.'" *Banks*, 29 F.4th at 174 (quoting *Olano*, 507 U.S. at 732). "Meeting all four prongs is difficult, 'as it should be.'"

12

*Puckett v. United States*, 556 U.S. 129, 135 (2009) (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 83 n.9 (2004)).

The government urges us to take the further step of reviewing this issue under the invited error standard of review, which would present an even higher bar for appellants. "It has long been recognized that 'a court can not be asked by counsel to take a step in a case and later be convicted of error, because it has complied with such request.'" *United States v. Herrera*, 23 F.3d 74, 75 (4th Cir. 1994) (quoting *Shields v. United States*, 273 U.S. 583, 586 (1927)); *see also United States v. Day*, 700 F.3d 713, 727 n.1 (4th Cir. 2012) ("[A] 'defendant in a criminal case cannot complain of error which he himself has invited.'" (quoting *Shields*, 273 U.S. at 586)). The government argues that appellants invited "precisely the action the district court took" (*i.e.*, correcting the written instructions without reinstructing the jury orally) when defense counsel suggested that the court "just substitute" the erroneous conspiracy language with the correct terms. Response Br. at 34 (quoting J.A. 2682). We do not need to resolve this question because appellants' argument fails under the plain error standard.

2.

Applying plain error review, we hold that appellants' argument fails. We need not decide whether the district court's decision not to reinstruct the jury orally as to the two misstatements was an error that created a fatal variance because appellants are wholly unsuccessful on prong three of plain error review. They cannot show that any error was prejudicial and affected their substantial rights.

13

Appellants fail to establish a reasonable probability that the jury would have found them not guilty but for the two misstatements in the oral instructions. "When considering jury instruction challenges, 'we do not view a single instruction in isolation,' but must assess the 'allegedly erroneous instruction in its full context,'" which includes "the trial as a whole." *United States v. Nsahlai*, 121 F.4th 1052, 1063–64 (4th Cir. 2024) (quoting *United States v. Tillery*, 702 F.3d 170, 176 (4th Cir. 2012); *see also Moore*, 810 F.3d at 936 ("[W]hen a constructive amendment claim rests on allegedly erroneous jury instructions, a reviewing court is to consider the totality of the circumstances.").

Here the full context confirms that the jury could not have convicted appellants for merely *conspiring* to commit the murders of Duarte-Lopez and Wood. We start with the jury instructions themselves. First, the judge correctly recited all five elements that the government was required to prove. J.A. 2667. Second, in the subsequent detailed instructions where the misstatements occurred, the judge correctly stated the relevant actus reus element: "The fourth element that the government must establish beyond a reasonable doubt as to Count Five is that the defendant *committed or aided and abetted the murder*." J.A. 2670 (emphasis added). The two references to "conspiracy" in the instructions for other elements of Count 5 did nothing to detract from the government's explicit and specific burden to prove that Jacome and Flores-Reyes *committed* or *aided and abetted* the murders—not that they merely conspired to do so. Third, the brief misstatements were unlikely to confuse or mislead the jury because, in the context of the entire set of instructions, they represented a mere two lines in 70 pages that took the judge two-and-a-

14

half hours to read. And finally, no one disputes that the written instructions distributed to each juror were correct.

We agree with the government that "even in the unlikely event that a juror had been confused by the court's oral slip, any confusion would have been cured by the corrected, written jury instructions." Response Br. at 40; *see also United States v. Granados*, 142 F.3d 1016, 1023 (7th Cir. 1998) ("The written instructions would have clarified any confusion the jurors may have had regarding the oral charge."); *United States v. Cook*, 603 F.3d 434, 438 (8th Cir. 2010); *United States v. Ross*, 338 F.3d 1054, 1057–58 (9th Cir. 2003); *United States v. Gold*, 743 F.2d 800, 822 (11th Cir. 1984) ("The trial judge here permitted the jury to take a copy of the instructions (in which the error did not appear) with them when they retired to deliberate, thus reducing the likelihood that a casual mistake could have had an improper effect.").

The rest of the trial record strongly supports the conclusion that there was no prejudice. The government consistently argued that Jacome and Flores-Reyes committed or aided and abetted the two murders, not that they merely conspired to do so. *See, e.g.*, J.A. 2696–700 (government arguing that Jacome "committed the alleged murder" and "killed Anner" by using a machete), 2700–08 (government arguing that Flores-Reyes "participate[d] in," "aided and abetted," and "helped achieve" Wood's murder). Indeed, as appellants acknowledge, the government "presented no closing argument to the jury on Counts 5 and 7 that referenced any conspiratorial basis for conviction." Reply Br. at 14.

Further, the government presented overwhelming evidence to the jury that Jacome and Flores-Reyes committed, or at a minimum aided and abetted, the two murders. We

15

review that evidence in detail below when addressing their sufficiency claims. It is enough to state here that the record evidence, taken in the light most favorable to the government, demonstrated that Jacome personally participated in the murder of Duarte-Lopez by using a machete to strangle and strike the young boy and that Flores-Reyes took affirmative steps to facilitate Wood's killing. Appellants have come nowhere close to showing that the jury convicted them on Counts 5 and 7 for simply *conspiring* to commit these murders. The actuality of their violence, not mere conspiratorial planning, was front and center before the jury. It was therefore clear to the jurors, as it is clear to us from the record, that appellants were directly involved in the commission of these murders.

In sum, we will not reverse the entire effort of the district court and jury over two lines of text in the oral jury charge that were corrected in the written instructions. Appellants got a lengthy jury trial with regard to the murders and other serious crimes. A jury of their peers rendered a verdict of guilty on all counts that was supported by overwhelming evidence. There is just no way, under the totality of the circumstances, that these two stray misstatements had an impact on the outcome of this trial.

## III.

Appellants' remaining arguments take aim at the district court's denial of their motions for judgment of acquittal or a new trial. However styled, all amount to challenges to the evidentiary support for some of their convictions.

Our review of a district court's denial of a motion for acquittal under Rule 29 is de novo. *United States v. Robinson*, 55 F.4th 390, 401 (4th Cir. 2022). When a defendant moves for acquittal on the basis of insufficient evidence, the district court must sustain the

16

jury's guilty verdict if substantial evidence, viewed in the light most favorable to the government, supports it. *Id.* We have explained that in the criminal context, "substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc).

We review the denial of a motion for a new trial under Rule 33 for abuse of discretion. *United States v. Saint Louis*, 889 F.3d 145, 157 (4th Cir. 2018). When a defendant moves for a new trial based on the weight of the evidence, a district court need not view the evidence in the light most favorable to the government and may evaluate witness credibility. *Id.* Even so, the court should grant a new trial "only when the evidence weighs heavily against the verdict." *Id.* (quoting *United States v. Arrington*, 757 F.2d 1484, 1486 (4th Cir. 1995)).

Bearing these well-established principles in mind, we address each of appellants' remaining arguments in turn.

### A.

We first consider Jacome's appeal of the district court's denial of his motion for acquittal on his conviction under Count 5 for the murder of Duarte-Lopez. Under 18 U.S.C. § 1959(a)(1), VICAR murder requires proof of "(1) an enterprise engaged in racketeering activity, (2) murder or aiding and abetting another person in murdering, and (3) murder undertaken for the purpose of gaining entrance into or maintaining the defendant's position in the enterprise." *United States v. Johnson*, 219 F.3d 349, 358 n.7 (4th Cir. 2000). Jacome was also charged under the federal aiding and abetting statute, 18 U.S.C. § 2. Under that

17

provision, a defendant is liable as a principal if "he (1) takes an affirmative act in furtherance of [an] offense, (2) with the intent of facilitating the offense's commission." *Rosemond v. United States*, 572 U.S. 65, 71 (2014).

Jacome argues that the district court erred in denying his motion for acquittal because no reasonable juror could find that he (1) committed or aided and abetted the murder of Duarte-Lopez or (2) did so to maintain or increase his position in MS-13. Neither argument persuades us.

1.

The evidence presented at trial showed that Duarte-Lopez was an eighth-grade student who collected rents and performed other "favors" for Jacome. J.A. 2370–71. Duarte-Lopez was a "paro," someone just starting to learn MS-13's rules and policies. J.A. 1043, 2131. In early 2016, his mother contacted police after discovering a gun in the family's apartment, which her son told her he had been given to keep because it "had been used to kill someone." J.A. 2370. When the police arrived, they found a machete under Duarte-Lopez's bed and took him in for questioning. Later that year, some LPS members reported to the Sailors that Duarte-Lopez was "dirty" and "cooperating with the police." J.A. 2131–32. Higher-ups from the program ordered the boy's death.

In December 2016, a Sailors member nicknamed "Katra" contacted Jose Azcunaga-Segura, a taxi driver who often gave rides to members of the gang. J.A. 2380–81. Katra hired Segura to pick up Jacome, Duarte-Lopez, and another gang member nicknamed "Skinny" and take them to a secluded area near Germantown. When the group arrived, Segura observed other gang members, including Katra, exit their vehicles. J.A. 2386.

18

Segura testified that his three passengers, including Jacome, "put on some gloves and took out some knives" and went into the woods with people from the other cars. J.A. 2384.

Katra told the jury that Duarte-Lopez had been led to believe that he was only going to receive a "corte," or disciplinary beating. J.A. 1416, 2135. Like Segura, Katra testified that he saw Jacome among the gang members who led Duarte-Lopez into the woods. When Katra entered the woods to join the group a few moments later, he saw Duarte-Lopez "struggling, fighting with the people that were hurting him." J.A. 2137. One gang member handed Katra a machete, which he used to "strangle" and "hit[]" Duarte-Lopez before handing the weapon to Jacome, who "also started strangling the victim" with the machete. *Id.* Katra watched Jacome strike Duarte-Lopez with the machete and strangle him with it until "the handle of the machete broke." J.A. 2137–38. The group dispersed when lookouts signaled that someone was coming.

When Jacome and Skinny returned to the car, Segura saw that Duarte-Lopez was not with them. The taxi driver testified that Jacome and Skinny got in and started "talking about how they had stabbed the kid" and "how they had killed him." J.A. 2387. They threw the gloves and knives out of the car window on the drive back. At some point during the return trip, Jacome communicated to Katra that Skinny had "dropped his phone" at the murder scene. J.A. 2139, 2387. The next day, Jacome and Skinny returned to the woods with two other gang members to locate the phone and Duarte-Lopez's body. They found the boy face-down in a creek, and all four helped bury the body. J.A. 2319–21.

19

2.

On appeal, Jacome does not contest these facts. Rather, he insists that *no reasonable juror* could, on this record, conclude beyond a reasonable doubt that he committed first- or second-degree murder under Maryland law or aided and abetted the same. On Jacome's view, his actions "[a]t most" could "be seen as operating to advance a brutal assault on Duarte-Lopez"—not murder. Opening Br. at 22.

Jacome makes much of the fact that Katra testified that Jacome only "hit" and "strangle[d]" Duarte-Lopez with the machete while Skinny and another gang member "stabbed" Duarte-Lopez with knives. Opening Brief at 21. But as Jacome acknowledges, the autopsy report showed that Duarte-Lopez was killed by "a combination of blunt force injury and sharp force injuries." Opening Br. at 20 (quoting J.A. 2498). And Katra's testimony does not contradict Segura's observation that both Jacome and Skinny entered the woods wearing gloves and carrying knives. Jacome suggests that he might have carried a knife merely "to threaten or intimidate Duarte-Lopez." Opening Br. at 21. But even assuming Jacome did not himself use a knife to stab Duarte-Lopez, a reasonable juror could infer that he carried a knife and led Duarte-Lopez into the woods "with the intent of facilitating" his murder. *Rosemond*, 572 U.S. at 71.

Jacome also emphasizes the supposed lack of evidence that he had any advance knowledge that Duarte-Lopez was to be killed rather than merely beaten. He maintains that in early 2016 he was "an inactive member of MS-13" and "effectively excluded from gang activity." Opening Br. at 5. Given the testimony the jury heard about Jacome's direct participation in the attack on Duarte-Lopez and subsequent burying of his body, a

20

reasonable juror could conclude that Jacome was actively involved in the clique at the time of the murder. Moreover, given Jacome's rank within LPS, his direct supervision of Duarte-Lopez, and the foundational MS-13 rule that speaking to law enforcement "carries a punishment of death," J.A. 1051, a reasonable juror could infer that Jacome knew that Duarte-Lopez had spoken with police and had to be killed for this indiscretion.

3.

As to Jacome's claim that the government failed to prove the "purpose" element of VICAR murder, both Jacome and the government agree that the relevant question is whether Jacome acted "for the purpose of . . . maintaining or increasing [his] position" in MS-13. 18 U.S.C. § 1959(a). This element is satisfied if the jury could reasonably infer that Jacome committed or aided and abetted the murder "because he knew it was expected of him by reason of his membership in [MS-13] or that he committed it in furtherance of that membership." *United States v. Zelaya*, 908 F.3d 920, 927 (4th Cir. 2018) (quoting *United States v. Fiel*, 35 F.3d 997, 1004 (4th Cir. 1994)).

Again, Jacome focuses on a lack of evidence showing that he was actively involved in the gang in late 2016, was personally aware that Duarte-Lopez had spoken to the police, or knew that the boy was to be killed. In *United States v. Tipton*, we found the VICAR purpose element satisfied where the evidence showed that a racketeering enterprise had policies requiring "violent retaliatory action" and that participating in such action was "an integral aspect of membership." 90 F.3d 861, 891 (4th Cir. 1996) (quoting *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992)). As explained above, the jury heard ample evidence from which it could infer that Jacome participated in Duarte-Lopez's killing "in

21

part at least in furtherance of [MS-13]'s policy" of punishing "rats" and that such participation was "expected of him by reason of his membership" and rank. *Id.*; *Zelaya*, 908 F. 3d at 927; J.A. 1051.

For these reasons, we hold that the district court properly denied Jacome's motion for acquittal as to Count 5.

## B.

Like Jacome, Flores-Reyes argues that the district court erred in denying his motion for acquittal on his conviction under Count 7 for VICAR murder. He contests only the crime-of-violence element, contending that no reasonable juror could find that he committed or aided and abetted the murder of Wood. Again, we disagree.

### 1.

In March 2017, an MS-13 member living in Virginia reported to the Sailors that a "chicken," an enemy of MS-13, was in the gang's territory. J.A. 1452, 2164. He sent Flores-Reyes a WhatsApp message with a photo of a hat with the letters "MS" and a large knife. J.A. 1183. A group of homeboys including Flores-Reyes and Katra then discussed how killing the enemy would provide an opportunity for lower-ranking members to move up in the clique. Katra testified that Flores-Reyes "let [the group] use his car" for the planned murder. J.A. 2165.

One week later, Katra directed Danny Ventura, another Sailors member, to drive Flores-Reyes's car to an address in Bedford, Virginia. The address belonged to Josue Coreas-Ventura, the gang member who first reported the enemy's presence. Sometime during the drive down, one of Ventura's passengers, a lower-ranking Sailors member called

22

"Sanchez," answered a call from Flores-Reyes. On speakerphone, Flores-Reyes told the group "[t]hat they were going to make some chicken soup." J.A. 1252. Everyone understood that this meant "they were on their way to kill someone." J.A. 1253. When the group arrived at Coreas-Ventura's apartment, they received more calls from homeboys in Maryland, including Flores-Reyes, telling them to "do what you're going to do" and then "come back to Maryland and it will be okay." J.A. 1255–56.

The group arrived at Wood's home later that night. They rode in Flores-Reyes's car, now driven by Victor Rodas. Wood was a seventeen-year-old high school student who lived with his mother and older brother. He thought the group was there to buy marijuana and went out to meet them. J.A. 1781. Sanchez testified that as Wood approached, Coreas-Ventura and another gang member "started beating" Wood and forced him into the car. J.A. 1782. Wood was "crying" and "screaming for help" as they drove away. *Id.* He eventually passed out from being held down by his neck.

The gang members drove Wood to a secluded area where Coreas-Ventura carried him out of the car and "threw him onto the ground." J.A. 1784. Sanchez testified that one of the gang members immediately began to "cut" Wood. *Id.* Coreas-Ventura directed the other members present, including Sanchez, to take their "turn" cutting Wood. J.A. 1785. The group ran when they heard a car approaching, leaving Wood's body behind. The next morning, Flores-Reyes and other homeboys called Ventura to ask if he had picked up the group members who ran off the night before. A passing car saw Wood's body by the side of the road and called 9-1-1. When the police investigator arrived on scene, he saw that Wood's right hand had been "amputated," his cheek had been slashed from ear to mouth,

23

and he had "heavy gashes" on his neck and "several stab wounds" on his chest. J.A. 1111–12.

2.

Flores-Reyes offers two reasons why, in his view, the evidence is insufficient to support the jury's finding that he committed or aided and abetted Wood's murder. Neither is persuasive.

First, Flores-Reyes contends that even if he was on the call when the murder was planned, Katra's testimony did not show "what, if any role [he] had in these discussions" or whether he "agreed to participate, or sanction the murder." Opening Br. at 51. Viewed in the light most favorable to the government, however, the trial testimony showed that Flores-Reyes was more than just passively present for the initial discussion. Katra testified that after the homeboys on the call, including Flores-Reyes, "decided who was going to go there to do the murder," Flores-Reyes agreed to "let [them] use his car." J.A. 2165. The evidence also showed that Flores-Reyes repeatedly contacted members of the group sent to kill Wood. Flores-Reyes informed them that the purpose of their trip was to "make some chicken soup," code for killing an enemy. He monitored the group's progress, encouraged them in their abominable task, and was among the homeboys who followed up the next day. In short, Flores-Reyes's attempt to use his supervisory role or rank in the MS-13 hierarchy to overturn the jury's view of his involvement in the murder fails.

Second, Flores-Reyes argues that the testimony from Katra, Ventura, and Sanchez about his participation "contained such material differences" that no reasonable juror could conclude that he committed or aided and abetted Wood's murder. The only specific

24

"material difference" Flores-Reyes identifies is Sanchez's statement that "no one" in the car discussed "what the plan was" for when they arrived, while Ventura testified that the group started "celebrating" when they learned from Flores-Reyes's call that they were on their way to make "chicken soup." J.A. 1777, 1252–53. It is not obvious that these statements are contradictory. And any alleged discrepancies in the testimony are for the jury, not ourselves, to resolve. *Burgos*, 94 F.3d at 862–63. In sum, we affirm the verdict of conviction of Flores-Reyes on Count 7.

C.

Finally, we address Contreras-Avalos's claims that the district court erred in denying his motions for acquittal and a new trial on his convictions under Counts 1 and 8 for RICO conspiracy and conspiracy to distribute drugs. Appellant offers a single argument for both assertions of error: that the government failed to offer "*any* physical or forensic evidence" against him and based its entire case on cooperator testimony. Opening Br. at 56–57.

Contreras-Avalos does not identify which pieces of testimony he believes were "hopelessly compromised" by virtue of coming from other gang members. Opening Br. at 57. Rather, he points to general statements by the government's gang expert, Sargeant Ricardo Guzman, who agreed during cross-examination that "it's best" to "corroborate" gang-member testimony with other evidence. J.A. 1082–83. Contreras-Avalos insists that his convictions cannot stand where the only evidence against him was the uncorroborated testimony of MS-13 members who were "criminals, felons, [and] repeated liars . . . desperate for sentence reductions." Opening Br. at 59.

25

It is not unusual, of course, for prosecutors to call criminally compromised individuals to the stand. Contreras-Avalos does not contend that the trial court denied him a proper opportunity to impeach the credibility of adverse witnesses. Both witness credibility and the weighing of conflicting evidence are quintessential matters for the finder of fact, not the reviewing court, to decide. *Burgos*, 94 F.3d at 868. This principle carries no less force when witnesses are of questionable moral character or have powerful incentives to avoid the truth. Even in the context of a Rule 33 motion for a new trial, where the district court may act as the "thirteenth juror" and "conduct its own assessment of witness credibility," *our* review is limited to assessing whether the court "exercised its discretion in an arbitrary or capricious manner." *United States v. Rafiekian*, 68 F.4th 177, 187 (4th Cir. 2023). There was no abuse of discretion here.

## IV.

We commend the district court for its conduct of a trial that was fair in every way. For the foregoing reasons, the judgment is in all respects affirmed.

*AFFIRMED*

26